# United States Court of Appeals
## For the First Circuit

---

No. 00-2420

RYAN IRON WORKS, INC.,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

NATIONAL SHOPMEN PENSION FUND; SHOPMEN'S
LOCAL 501 INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL AND ORNAMENTAL IRONWORKERS, AFL-CIO,

Intervenors.

---

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF THE
NATIONAL LABOR RELATIONS BOARD

---

Before

Lynch, <u>Circuit Judge</u>,

Coffin, <u>Senior Circuit Judge</u>,

and Schwarzer,[*] <u>Senior District Judge</u>.

---

<u>Robert P. Corcoran</u>, for petitioner.

---

[*]Of the Northern District of California, sitting by designation.

William M. Bernstein, Senior Attorney, with whom Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief, for respondent.

Marc H. Rifkind, with whom Lynn A. Bowers, Marc A. Tenenbaum, Slevin & Hart, P.C., Mary T. Sullivan and Segal, Roitman & Coleman were on brief, for intervenor.

_____

July 16, 2001

_____

**SCHWARZER, <u>Senior District Judge</u>.** Ryan Iron Works, Inc.

(Ryan) petitions for review of an order of the National Labor Relations

Board (Board) finding violations of Sections 8(a)(3) and (5) of the

National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(3) and (5).

The Board has cross-applied for enforcement of its order in which it

found that Ryan had committed a series of unfair labor practices during

negotiations for a new collective bargaining agreement (CBA) with the

bargaining representative of its employees, Shopmen's Local 501,

International Association of Bridge, Structural and Ornamental

Ironworkers, AFL-CIO (the Union), and that an economic strike of its

employees was converted into an unfair labor practice strike following

an incident of direct dealing between Ryan's president and one of its

workers.  We affirm the Board's order with respect to the unfair labor

practices but hold that the record lacks substantial support for the

finding that the strike was converted prior to its termination on

December 8, 1995.  Accordingly, we grant the Board's application in

part only.

### FACTUAL BACKGROUND

Ryan is a corporation engaged in the fabrication of iron,

steel and metal products at its plant in Raynham, Massachusetts.  It

has been party to a series of CBAs with Local 501 for more than twenty-

five years.  The most recent CBA between the parties was in effect from

September 11, 1992, to September 10, 1995.  The events giving rise to

-3-

this controversy occurred in the course of the negotiations for a successor CBA.

The parties met in negotiations eight times from August 18 to November 10, 1995. The Union presented a list of demands, including significant wage and benefits increases, and Ryan, in turn, proposed to reduce wages and benefits in several areas. At the August 29 session, Union representative David Mortimer (Mortimer) told Ryan's negotiating team that the company's proposal was "an insult and a piece of garbage" and that the Union "would not give up one cent" in givebacks or concessions of any kind. Another Union official made a similar comment at the August 31 session, where Ryan offered to increase its pension and health insurance contributions, and reiterated that the Union would not agree to any givebacks or concessions.

On September 7 the Union filed an unfair labor practice charge against Ryan for failure to bargain in good faith, a charge that was ultimately rejected by the Board. On September 8 the employees voted to reject Ryan's proposal. Because of the pendency of the charge, the Union told its members that a strike would be an unfair labor practice strike as opposed to an economic strike, meaning that none of them could be permanently replaced.[1] The members took a strike

---

[1] Unlike economic strikers, unfair labor practices strikers are entitled to reinstatement and back pay even if they have been replaced during the strike. NLRB v. Harding Glass Co., Inc., 80 F.3d 7, 10 n.3 (1st Cir. 1997).

vote and went out on September 11, the day after the CBA expired. The parties continued to meet, however, and at the September 18 session the Union modified its proposal, reducing both its hourly wage and pension fund contribution demands. Ryan rejected this proposal and on October 2 countered with a proposal which included an increase in vacation time for certain employees and the shoe allowance but enlarged its right to subcontract unit work. The Union rejected this proposal but made a counterproposal for a three-year contract providing for increased wages and pension contributions.

On October 23, Ryan's president, Howard Shea (Shea), invited Wallace Penniman (Penniman), who was walking the picket line with twenty to thirty other striking employees, to take a ride to inspect one of Ryan's construction jobs. Penniman agreed and the two men drove off. The parties dispute much of the content of the conversation during that car trip. According to Penniman, Shea stated "that it was the Union's fault [that negotiations were going poorly] because they weren't negotiating with the Company" and asked what exactly the men wanted. Penniman told Shea that the employees' main concern was seniority, and Shea responded that Ryan's proposal on seniority was merely a bargaining tool or a smokescreen to gain concessions. Shea told Penniman "that [Ryan] was going to need another three-year pay freeze to be competitive with the non-union shops." The two men then discussed the possible pay freeze, as well as vacations, holidays, work

boot allowances, subcontracting, pensions, health insurance and arbitration. According to Penniman, the discussion was extensive, lasting the entire drive to Waltham and back, a trip of about three hours. Before dropping him off, Shea told Penniman that this was the type of negotiating he was hoping for from the Union and said that there were only a few items on Ryan's list that it needed. As Penniman got out of the car at the picket line, Shea told him "not to worry about it, that it was going to be resolved."

In his testimony, Shea admitted that he told Penniman that the Union had refused to respond to any of the company's proposals but denied that there was any substantive discussion of Ryan's bargaining proposals. According to Shea, when Penniman asked him about the negotiations, Shea told him they should not discuss them.

The Administrative Law Judge (ALJ) accepted Penniman's version of the conversation and found that Shea had dealt directly with an individual employee concerning the negotiations, thereby unlawfully bypassing and undermining the Union.

Penniman testified that the conversation led him to feel optimistic about the possibility of a quick resolution and that he shared it with the other picketers who saw him leave and return with Shea. Later that day he told Union representative Mortimer about the conversation and Mortimer arranged for another negotiating session on October 25. The parties dispute whether the Union brought up the

Shea/Penniman conversation at that session. Ryan argues that there was no mention of the incident and Mortimer testified as much, but Union negotiator James Devlin testified that when he raised the question of the differences between the positions taken by Ryan at the table and those taken away from the table he was referring in part to the Shea/Penniman incident. In any case, Ryan did not change its position. When Union officials reported this to the employees, the employees reacted with disappointment and anger. Having been led to believe that an early resolution was in the offing, some blamed the Union for the lack of progress.

On November 6 Ryan unilaterally altered the terms of employment by implementing the changes in the CBA set out in its October 2 proposal. On November 10 it also discontinued contributions to the National Shopmen Pension Fund (Fund) required under the expired CBA. At the final negotiating session on that same day, the Union modified its earlier proposal and accepted some of Ryan's proposals. Ryan rejected the Union proposal and stood on its October 2 proposal. On November 16 the Union withdrew its previous proposal and offered a three-year extension of the expired contract with several wage freeze concessions. On November 21 Ryan rejected that proposal but told the Union that it was willing to meet to "discuss the significant differences between them."

On December 7 Ryan received a petition signed by fifty-five

employees stating that they no longer wished to be represented by the Union and it notified the Union that it was therefore withdrawing recognition from the Union. On December 8 the Union voted to end the strike and faxed Ryan a letter offering the return of all striking workers to their jobs by December 11. When the workers showed up they were met by Shea, who told them there were no jobs for them.

### STANDARD OF REVIEW

We grant the Board "deference with regard to its interpretation of the Act as long as its interpretation is rational and consistent with the statute." NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 22 (1st Cir. 1999). "The Board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole." Id. at 21. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (citation omitted). The ultimate question is "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion.'" NLRB v. Hosp. of San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000) (quoting Allentown Mack Sales & Svc., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998)).

## I. THE DIRECT DEALING CHARGE

### A. The Unfair Labor Practice Charge

The Board accepted the ALJ's finding that Shea's discussion

with Penniman was a violation of Section 8(a)(5), which prohibits employers from bypassing the Union and dealing directly with employees. Ryan initially attacks the ALJ's credibility determination, which was based principally on the relative demeanor of the witnesses and affirmed by the Board.[2] That determination is entitled to great weight because the ALJ saw and heard the witnesses testify, see Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d 302, 308 (1st Cir. 1993), and we will not disturb it so long as the ALJ's position represents a choice between two fairly conflicting views. We will set aside such findings only if we believe that the ALJ overstepped the bounds of reason. Id.; 3-E Co., Inc. v. NLRB, 26 F.3d 1, 3 (1st Cir. 1994). While the ALJ's finding may have been somewhat conclusory, we see nothing in the record to suggest that it was unreasonable.

Ryan next contends that even if Penniman's testimony is credited, the conversation he describes is not sufficient to establish a direct dealing violation. Section 8(a)(5) of the Act imposes a duty on an employer to bargain collectively with its employees' chosen representative. This obligation is exclusive and Section 9(a) of the Act, 29 U.S.C. § 159(a), accordingly "exacts the negative duty to treat

---

[2]The ALJ gave three reasons for believing Penniman over Shea, only one of which was adopted by the Board: Penniman's demeanor. The other two were: (1) the ALJ's incorrect belief that Penniman was no longer a Ryan employee or a Union member and therefore had no stake in his testimony, and (2) his assumption that Shea would not take a striking worker from the picket line for a drive and not mention the strike.

with no other.'" Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 684 (1944) (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44 (1937)). "[O]rderly collective bargaining requires that the employer be not permitted to go behind the designated representatives, in order to bargain with the employees themselves. . . ." Id. at 685. "The fundamental inquiry in a direct dealing case is whether the employer has chosen to deal with the Union through the employees, rather than with the employees through the Union.'" NLRB v. Pratt Whitney Air Craft Div., 789 F.2d 121, 134 (2d Cir. 1986) (citation omitted).

The Board found that Shea's discussion with Penniman amounted to direct dealing because "[Shea] told Penniman that it was the Union's fault because they [sic] were not negotiating with the Company, asked Penniman what the employees wanted, and sought to minimize [Ryan's] bargaining demands." Ryan contends that the Board erroneously applied the law and that Shea's comments were merely an attempt to inform employees about the course of the negotiations and Ryan's position. See United Technologies Corp., 275 NLRB 1069, 1074 (1985) ("[A]n employer has a fundamental right, protected by Section 8© of the Act, to communicate with its employees concerning its position in collective bargaining negotiations and the course of those negotiations."). Ryan characterizes the incident as simply conversation about proposals which had already been submitted to the Union and encouragement to press Union officials to start talking to management. Although Ryan concedes

that Shea blamed the Union for the lack of progress, it argues that Shea never encouraged Penniman to abandon the Union in order to achieve a better deal.

While an employer may communicate or clarify its position to employees, Shea, even if he did not encourage abandonment of the Union, went well beyond what is permissible. Shea told Penniman that the failure of negotiations was the Union's fault and actively solicited Penniman's input on "what exactly . . . the men want." Such solicitation allows an employer to gain intelligence on employees' views and to gauge the level of support for a particular position, undermining the chosen representative's exclusive right to perform these functions. See Alexander Linn Hosp. Ass'n, 288 NLRB 103, 106 (1988), enforced, NLRB v. Wallkill Valley Gen. Hosp., 866 F.2d 632 (3d Cir. 1989); NLRB v. M.A. Harrison Mfg. Co., 682 F.2d 580, 581-82 (6th Cir. 1982) (enforcing Board order against employer for bypassing Union by directly soliciting employee views on an insurance plan). Shea, through Penniman, obtained information about the employees' views on seniority, holidays, vacation time, a 401K plan, health insurance, a work boot allowance and subcontracting. This is a virtual laundry list of the issues Ryan and the Union were covering in negotiations.

Contrary to Ryan's contentions, Shea's comments on these subjects went beyond merely clarifying the proposals the company had already submitted to the Union. For instance, he told Penniman that

-11-

several of Ryan's stated positions were smokescreens, and that Ryan only intended to take away two holidays rather than the five it demanded at the bargaining table. Additionally, his subsequent comment to Penniman that, "that's what we're looking for, that kind of negotiating," implies that he was attempting to negotiate with the employees through Penniman. Rather than "merely communicat[ing] what was already before the Union in a proper exercise of [Ryan's] free speech rights," Shea sought feedback from an employee to strengthen Ryan's position in the negotiations. Cf. Americare Pine Lodge Nursing and Rehab. Ctr. v. NLRB, 164 F.3d 867, 877 (4th Cir. 1999). That Shea picked Penniman up at the crowded picket line and three hours later dropped him off where other employees would notice and ask questions reinforces this conclusion.

This case thus bears no resemblance to Americare Pine Lodge Nursing and Rehabilitation Center v. NLRB, 164 F.3d at 878-79, on which Ryan relies. There, a supervisor asked a bargaining unit employee during a smoking break what she thought of a recent employer proposal, the employee responded that it "sounded good, but that it was only made to get rid of the Union," and the conversation went no further. Id. at 878. The court held that "[n]o reasonable person could conclude that this brief exchange eroded the Union's position as the exclusive bargaining representative." Id. Shea's three-hour discussion with Penniman was more than this "casual conversation." Id. Shea actively

solicited Penniman's views, made new proposals, and, at least with respect to the subcontracting issue, questioned Penniman as to how the company's offer could be improved.  Id. at 879.

In sum, substantial evidence supports the Board's finding that Shea's October 23 conversation with Penniman violated Section 8(a)(5) of the Act.

B.   Conversion

"A strike begun in support of economic objectives becomes an unfair labor practice strike when the employer commits an intervening unfair labor practice which is found to make the strike last longer than it otherwise would have." Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1079 (1st Cir. 1981).  Not every unfair labor practice will convert a strike, however.  We have held that "[c]ausation is crucial: ‹It must be found not only that the employer committed an unfair labor practice after the commencement of the strike, but that as a result the strike was "expanded to include a protest over [the] unfair labor practice[]," and that settlement of the strike was thereby delayed and the strike prolonged.'" Harding Glass, 80 F.3d at 10 (quoting Soule Glass, 652 F.2d at 1079-80).  The General Counsel bears the burden of establishing that "the unlawful conduct was a factor (not necessarily the sole or predominate one) that caused a prolongation of the work stoppage." C-Line Express, 292 NLRB 638 (1989).  The Board may consider both objective and subjective evidence in assessing

whether the General Counsel has met this burden:

> Applying objective criteria, the Board and
> reviewing court may properly consider the
> probable impact of the type of unfair labor
> practice in question on reasonable strikers in
> the relevant context.  Applying subjective
> criteria, the Board and court may give
> substantial weight to the strikers' own
> characterization of their motive for continuing
> to strike after the unfair labor practice.

Soule Glass, 652 F.2d at 1080.

The ALJ found that Shea's activity did not convert the strike because there was no evidence that the employees continued to strike because of it.  A majority of the Board disagreed, finding that the strike had been converted because the unlawful effort to bypass the Union's representatives "could not help but prevent and inhibit good-faith bargaining, thereby prolonging the strike."  It further found this objective inference to be supported by subjective evidence of the divisive effect of this conduct on the strikers and their union negotiators.  Board Member Hurtgen dissented, finding that there was no evidence that the single, isolated incident of direct dealing had a deleterious impact on subsequent negotiations or that it prolonged the strike.

> The Board has in the past recognized that:
>
> the presence or absence of evidence of
> [employees'] subjective motivation has not always
> been the sine qua non for determining whether
> there has been a conversion. Certain types of
> unfair labor practices by their nature will have

-14-

a reasonable tendency to prolong the strike and therefore afford a sufficient and independent basis for finding conversion. The most notable examples typically involve an unlawful withdrawal of recognition which may be accompanied by a course of other unlawful conduct, including withdrawal of contract proposals, refusals to meet and bargain, and recognition of another union. The common thread running through these cases is the judgment of the Board that the employer's conduct is likely to have significantly interrupted or burdened the course of the bargaining process.

C-Line Express, 292 NLRB at 639. See also Harding Glass, 80 F.3d at 11 (citing SKS Die Casting & Machining, Inc. v. NLRB, 941 F.2d 984, 991 (9th Cir. 1991) (refusal to reinstate strikers); Vulcan Hart Corp. (St. Louis Div.) v. NLRB, 718 F.2d 269, 276 (8th Cir. 1983) (withdrawal of recognition)). But, as we said in Harding Glass:

Always, however, the principal focus must remain on the element of causation, and specific, subjective evidence of changed motivation may be foregone only in those instances in which the objective factors by themselves establish unequivocally that a conversion occurred.

80 F.3d at 12. Here, the Board relies on what it calls an "objective inference" that Shea's conduct prolonged the strike, but it cites no objective evidence and we agree with the ALJ that "there is simply no evidence that the employees continued to strike because of Shea's activity." Nor do the decisions in Safeway Trails, 233 NLRB 1078 (1977), enforced, 641 F.2d 930 (D.C. Cir. 1979), and Beaumont Glass Co., 310 NLRB 710 (1993), on which the Board relied, support its

-15-

decision.

The Board has in another context described Safeway Trails as involving "an egregious effort by the employer to obtain the employees' repudiation of their union representative as a precondition to revoking a collective bargaining agreement." Forest Grove Lumber Co., 275 NLRB 1007, 1007 n.1 (1985). There, the employer had engaged in repeated oral and written communications with employees and others clearly intended to undermine the status and authority of the union's chosen bargaining representative in violation of Section 8(a)(5). These efforts to undermine the union representative were well known to the employees and were discussed at meetings of the union membership. The Board found that:

> Under these circumstances, the inference is clear that the Respondent's actions and communications served to aggravate and prolong the strike. The fact that the Respondent was not successful in undercutting [the Union representative] does not negate our finding that the Respondent's misconduct was a concern to employees and a factor in the prolongation of the strike. Moreover, the very nature of the Respondent's misconduct--appealing directly to employees in an attempt to undercut the union representative--is such as could not help but prevent and inhibit good-faith bargaining, thereby prolonging the strike.

Safeway Trails, 233 NLRB at 1082.

The instant case--involving a single incident which had no discernible impact on the ongoing bargaining process--bears no

resemblance to Safeway Trails.  Nor does it bear even remote

resemblance to Beaumont Glass, where conversion was found on evidence

that: the employer sent a memorandum to the membership of the union

with a proposal which had not previously been made at the bargaining

table; the employees complained to the union representative when he

told them the proposal would not be put to a vote; the representative

testified that "the publication and distribution of the memorandum

destroyed the negotiations" and that no meaningful negotiating sessions

were held subsequently;  and the union changed the language on its

picket signs to signify it was protesting the employer's unfair labor

practices.  310 NLRB at 719.  No such evidence appears in this record.

Indeed, if the Shea/Penniman incident was ever mentioned at the October

25 negotiating session at all, it was at most a passing reference.[3]

Mortimer later testified that no progress was made during that session

because "we both agreed that we were just making no changes.  We were

sticking to our proposal. . . . After a little discussion from both

sides, it was obvious nothing was going to change. . . ."  The incident

was apparently not mentioned at the October 30 session either and, as

noted above, the Union did not file an unfair labor practice charge

regarding the incident until nearly six months later.

We find Forest Grove Lumber Company, 275 NLRB 1007, more

closely on point.  There, the employer, during a strike, had several

---

[3]See supra p. *, lines 93-99.

-17-

discussions with employees about the status of negotiations, many quite similar to the Shea/Penniman conversation. Employees testified that the vice president spoke to them about the company's proposals, the stalemate in negotiations, and the union's refusal to bargain, and solicited their views on what it would take to get the strikers back to work. One employee stated that the vice president told him that the company's proposal was not a firm proposal, that everything was negotiable, and that only by asking for more than what it wanted could the company reach an agreement. In rejecting the General Counsel's contention that the strike had been converted, the Board said:

> Safeway Trails involved the factual context of an egregious effort by the employer to obtain the employees' repudiation of their union representative as a precondition to revoking a collective-bargaining agreement. Consequently, the unlawful conduct in Safeway Trails clearly intruded on the bargaining process and "could not help but" prolong the strike. In contrast, the Respondent's unlawful conduct here involved solicitation of employees to urge their representatives to soften the Union's bargaining demands, and there was no effort to repudiate those bargaining representatives. The unfair labor practices here did not have any inevitable impact on bargaining that would necessarily cause prolongation of the strike.

Id. at 1007 n.1.

Simply put, that the Shea/Penniman conversation may have raised hopes among employees for an early end to the strike--hopes that were dashed when negotiations resumed, leading to "consternation" among

-18-

employees--does not support the conclusion that the strike was thereby prolonged. "The Board's obligation is to provide some basis for an inference that, in the aftermath of the [unfair labor practice], the employees were separately motivated by that act." Harding Glass, 80 F.3d at 12. It is clear that the strike was about economic issues and there is no evidence that the strikers' motivation changed, in whole or in part, on account of the Shea/Penniman incident.[4] See Facet Enterprises, Inc. v. NLRB, 907 F.2d 963, 977 (10th Cir. 1990) ("[T]o sustain a finding of conversion, there must be some evidence in the record that the . . . employees reacted to information of Facet's direct dealing substantively in a fashion which aggravated or prolonged the strike."); see also F.L. Thorpe & Co., Inc. v. NLRB, 71 F.3d 282, 288 (8th Cir. 1995) (holding it was error to base conversion finding on "caused consternation" test where evidence established strike remained economically motivated); Gibson Greetings, Inc., 310 NLRB 1286, 1292 n.5 (1993) (finding no conversion because "[a]lthough several strikers testified that they were distressed by the [Company's] letter, none suggested that it was because of that letter that the strike continued,

---

[4]The General Counsel did not brief the issue but contended at oral argument that the record was devoid of any evidence that the strikers were separately motivated by the Shea/Penniman conversation because the ALJ erroneously sustained Ryan's objections to the necessary line of questioning. However, because the General Counsel's offer of proof, while it shows that the strikers were disturbed by the direct dealing, fails to establish that the strikers shifted the focus of their protest to include the Shea/Penniman incident and thereby prolonged the strike, we find no prejudice.

-19-

nor that the strikers discussed it collectively as a basis for continuing the strike."), enforcement denied on other grounds, Gibson Greetings, Inc. v. NLRB, 53 F.3d 385 (D.C. Cir. 1995); Soule Glass, 652 F.2d at 1082.

Thus, while we find no basis for disturbing the Board's determination with regard to the direct dealing charge, our review of the record persuades us that the finding of conversion on that basis is not supported by substantial evidence.

## II. THE UNILATERAL IMPLEMENTATION CHARGE

### A. The Unfair Labor Practice Charge

On November 6, when some cross-over employees began returning to work, Ryan implemented its October 2 contract proposal. The Board determined that this unilateral implementation was an unlawful labor practice and, further, that it converted the strike to an unfair labor practice strike.

"[A]n employer must bargain to impasse before making a unilateral change" in terms and conditions of employment. Visiting Nurse Serv. of W. Mass., Inc. v. NLRB, 177 F.3d 52, 57 (1st Cir. 1999). "'Impasse occurs when, after good faith bargaining, the parties are deadlocked so that any further bargaining would be futile,' i.e., when 'there [is] no realistic prospect that continuation of discussions at that time would . . . [be] fruitful.'" Beverly Enters.-Mass., 174 F.3d at 27 (citation omitted). Relevant factors include "'[t]he bargaining history, the good

faith of the parties in the negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations.'" NLRB v. Charles D. Bonanno Linen Serv., Inc., 630 F.2d 24, 35 n.24 (1st Cir. 1980) (citation omitted). We have held in the past that the determination of whether the parties reached good-faith impasse is particularly well-suited to the expertise of the Board.  See Beverly Enters.-Mass., 174 F.3d at 27.

The Board found that although during the four months of negotiations there had been "limited movement," credible evidence showed that Ryan had not been adamant on all its proposals.  Both sides made some concessions, and more importantly, Ryan never told the Union that failure to agree on its proposal would result in deadlock or that there was an impasse and that it would implement its proposals.  See Hotel Roanoke, 293 NLRB 182, 185 (1989) ("The failure of a party to communicate to the other party the paramount importance of the proposals presented at the bargaining table or to explain that a failure to achieve concessions would result in a bargaining deadlock evidences the absence of a valid impasse."). Nor is there evidence that when Ryan implemented its October 2 proposal, or at any time thereafter, a contemporaneous understanding existed between the parties that talks were at an impasse.  Indeed, the parties held a negotiating session with a federal mediator on November 10, after the

-21-

implementation, and the Union offered additional concessions at that time.  And in a letter dated November 21, Ryan's counsel stated that although the Union's latest proposal was unacceptable, it was willing to meet and discuss "the Company's outstanding offer of October 2nd." Ryan had the burden of proof on this issue and it failed to sustain it.  See PRC Recording Co., 280 NLRB 615, 635 (1986), enforced, Richmond Recording Corp. v. NLRB, 836 F.2d 289 (7th Cir. 1987).

Substantial evidence supports the Board's finding that Ryan's unilateral implementation of its October 2 proposal violated Section 8(a)(5) of the Act.

B.    Conversion

The Board determined that this violation also converted the strike, finding that "[i]n conjunction with Shea's earlier bypass of the Union, it can be inferred that [Ryan's] unilateral changes were also unfair labor practices that prolonged the strike."  The Board found that the employees must have been aware of the implementation of the October 2 proposal no later than November 11, when striking workers would have noticed that cross-over and replacement employees were working on Veterans Day, a holiday, and thus that there had been a unilateral change in the holiday policy.  However, as the Board determined earlier in its opinion, it was not unlawful for Ryan to implement different terms of employment for striker replacements because struck employers have no obligation to bargain about terms of

-22-

employment for replacements.  See Detroit Newspaper Agency, 327 NLRB 871 (1999); see also Service Electric Co., 281 NLRB 633 n.1 (1986) (because interests of returning economic strikers are more closely aligned with those of the strike replacements than those of the strikers, an employer has no greater duty to bargain during the strike over their terms of employment than it does over the strike replacements'). Strikers observing workers at the plant that day would therefore not necessarily have concluded that their presence meant that the terms of the CBA had been unilaterally changed.

In any event, the Board's evidence is, at best, circumstantial (if not entirely speculative) proof that employees may have known that a change had been made in the terms of (their) employment. But it fails to satisfy "[t]he Board's obligation . . . to provide some basis for an inference that, in the aftermath of the implementation, the employees were separately motivated by that act." Harding Glass, 80 F.3d at 12.  There is no objective or subjective evidence that the arrival of workers on a holiday motivated the striking employees to prolong the strike or that it interfered with the bargaining process.

The Board's finding of conversion is not supported by substantial evidence.  See Beverly Enters.-Mass., 174 F.3d at 22 n.1 ("Substantial evidence is not a rubber stamp.").

**III. WITHDRAWAL OF RECOGNITION**

The Board found that on December 6 Ryan received a petition from some fifty-five cross-over and replacement workers (out of a total of ninety-five employees), stating that they did not want to be represented by the Union.  On December 7 Ryan withdrew recognition based on the petition.  On December 8 the Union advised that its members would unconditionally return to work on December 11.  On that date, Ryan declined to reinstate the strikers, although sometime later it offered reinstatement to all but twelve of the original sixty-one strikers.  The Board found the withdrawal of recognition "in the context of unremedied unfair labor practices on December 7" to be a violation of Section 8(a)(5).

During the term of a CBA, an incumbent union enjoys an irrebuttable presumption of majority employee support. See Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 786 (1996).  Upon expiration of the contract, the employer can rebut that presumption and withdraw recognition if it can show either that the union in fact lacked majority support or that the employer had a good faith, objectively justified doubt regarding the union's majority.  See Destileria Serrales, Inc. v. NLRB, 882 F.2d 19, 20-21 (1st Cir. 1989).  However, if an employer has "committed as yet unremedied unfair labor practices that could have reasonably tended to contribute to employee disaffection from the union," it may not rely on employee expressions of disaffection, such as a petition, as a basis for withdrawal of

recognition.  United Supermarkets, Inc. v. NLRB, 862 F.2d 549, 553 n.6
(5th Cir. 1989)(citing Chicago Magnesium Castings Co., 256 NLRB 668,
674 (1981)); accord Bolton-Emerson, Inc. v. NLRB, 899 F.2d 104, 107-08
(1st Cir. 1989)("justified withdrawal [of recognition] requires . . .
a context free of unfair labor practices"); Soule Glass, 652 F.2d at
1110.      The General Counsel must prove a causal relationship
between unremedied unfair labor practices and the loss of majority
status, but direct evidence showing actual taint is not required.  See
United Supermarkets, Inc., 862 F.2d at 552 n.5.  It is sufficient that
the unfair labor practices would reasonably tend to cause employee
disaffection.  See NLRB v. Hi-Tech Cable Corp., 128 F.3d 271, 279 (5th
Cir. 1997).  Factors typically considered include: (1) the length of
time between the unfair labor practices and the withdrawal of
recognition; (2) the nature of the illegal acts, including the
possibility of their detrimental or lasting effect on employees; (3)
any possible tendency of the unfair labor practices to cause employee
disaffection from the union; and (4) the effect of the unlawful conduct
on employee morale, organizational activities, and membership in the
union.  Master Slack Corp., 271 NLRB 78, 84 (1984).  Here, the petition
was presented six weeks after the direct dealing incident and four
weeks after the unlawful November 6 implementation, both violations of
a type that weaken the authority of a union and encourage employees to
doubt its ability to successfully represent them.  While we think it is

a close question, we conclude that the Board could reasonably consider that these two unfair labor practices, particularly in combination, "significantly contributed" to the Union's loss of majority status. Williams Enters., Inc., 312 NLRB 937, 940 (1993), enforced, NLRB v. Williams Enters., Inc., 50 F.3d 1280 (4th Cir. 1995). We therefore affirm the Board's bargaining order.

Because the strike ended at approximately the same time as the withdrawal of recognition (at least there is no evidence of any employees being replaced on December 7 or 8), conversion is not an issue and we do not read the Board's order as making a determination of conversion based on withdrawal of recognition. Because we reject the Board's determinations of conversion on October 23 or November 11, the strikers are entitled only to the reinstatement rights of economic strikers. See Rose Printing Co., 289 NLRB 252, 253 (1988).

**CONCLUSION**

We affirm the Board's finding that the October 23 Shea/Penniman conversation and the November 6 unilateral implementation of Ryan's bargaining proposal constituted unfair labor practices. Further, we affirm the Board's finding that these practices "significantly contributed" to the Union's loss of majority status. Consequently, we affirm that portion of the Board's remedial order aimed at undoing the effects of these practices. This includes the provisions of the order requiring Ryan to recognize and bargain with

the Union and, upon request, to rescind and compensate for the unilateral changes made on or after November 6, 1995 to the terms of employment for bargaining unit employees.  However, because we reject the Board's determinations of conversion, we deny enforcement of that portion of the Board's order granting reinstatement and backpay to unfair labor practice strikers.  Because we find that no conversion, and hence no unfair labor practice strike, occurred, this relief is no longer apposite.  Accordingly, the Board's application for enforcement of its order is granted in part and denied in part.

GRANTED in part, DENIED in part.