# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 10, 2015                    Decided August 7, 2015

No. 14-1107

SW GENERAL, INC., DOING BUSINESS AS
SOUTHWEST AMBULANCE,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

---

Consolidated with 14-1121

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*Alison N. Davis* argued the cause for the petitioner. *Sherron McClain* was with her on brief. *Jennifer W. Thomas* entered an appearance.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for the respondent. *Richard Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney, were with her on brief.

Before: HENDERSON, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This case involves a labor dispute between an ambulance company and its employees. We do not reach the merits of that dispute, however, because we conclude that Lafe Solomon, the former Acting General Counsel of the National Labor Relations Board (NLRB or Board), served in violation of the Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. §§ 3345 *et seq.* Accordingly, the unfair labor practice (ULP) complaint issued against the ambulance company was unauthorized. We grant the petition for review, deny the cross-application for enforcement and vacate the Board's order.

## I.  BACKGROUND

### A.  VACANCY STATUTES

The FVRA is a response to what Chief Justice John Marshall called "the various crises of human affairs"—problems that arise when our Constitution confronts the realities of practical governance. *M'Culloch v. Maryland*, 17 U.S. 316, 415 (1819). Specifically, the Appointments Clause generally requires "Officers of the United States" to be nominated by the President "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2, cl. 2. Advice and consent is "more than a matter of etiquette or protocol"; it is a "structural safeguard[]" intended to "curb Executive abuses of the appointment power" and to "promote a judicious choice of persons for filling the offices of the union." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quotation marks and alterations omitted). But vacancies can occur unexpectedly (due to death, resignation, illness, etc.) and the

confirmation process takes time. *See* ANNE JOSEPH O'CONNELL, WAITING FOR LEADERSHIP at 10 fig. 5 (2010) (finding average lag time of 190 days between vacancy and confirmation). To keep the federal bureaucracy humming, the President needs the power to appoint acting officers who can serve on a temporary basis without first obtaining the Senate's blessing.

Since the "beginning of the nation," the Congress has given the President this power through vacancy statutes. *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 209–10 (D.C. Cir. 1998) (citing, *inter alia*, Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281). [1] The predecessor to the FVRA, the Vacancies Act, was first enacted in 1868. *See* Act of July 23, 1868, ch. 227, 15 Stat. 168. The Vacancies Act allowed the President to fill vacancies with temporary acting officers, subject to limitations on whom he could appoint and how long the appointee could serve. *See* Pub. L. No. 89-554, 80 Stat. 378, 426 (Sept. 6, 1966); Pub. L. No. 100-398, 102 Stat. 985, 988 (Aug. 17, 1988).

Presidents, however, have not always complied with the Vacancies Act. *See* MORTON ROSENBERG, CONG. RESEARCH SERV., 98-892 A, THE NEW VACANCIES ACT: CONGRESS ACTS TO PROTECT THE SENATE'S CONFIRMATION PREROGATIVE 2–3 (1998). By 1998, an estimated 20% of all officers in positions requiring presidential nomination and Senate confirmation (PAS positions) were serving in a temporary acting capacity,

---

[1] The Constitution also partially addresses this problem. The President can temporarily fill vacancies "that may happen during the Recess of the Senate." U.S. CONST. art. II, § 2, cl. 3. But the Recess Appointments Clause is an incomplete answer because the President may need to install an acting officer *before* the Senate's next recess.

many well beyond the time limits prescribed in the Vacancies Act. *See id.* at 1. Nor was the Vacancies Act particularly amenable to judicial enforcement. In *Doolin*, for example, we did not decide whether the acting director of the Office of Thrift Supervision lacked statutory authority because we determined that any error in his appointment was cured. *See* 139 F.3d at 214. We relied on the doctrine of ratification: because the director's decision was later approved by a properly appointed director, any defect in his appointment was immaterial. *See id.* at 212–14. Our decision in *Doolin*, along with the President's appointment of Bill Lann Lee to be Acting Attorney General of Civil Rights in 1997, prompted congressional action. *See* ROSENBERG, *supra*, at 1, 8.

In June 1998, Senators Fred Thompson, Robert Byrd, Strom Thurmond and others introduced the FVRA to strengthen, and ultimately replace, the Vacancies Act. *See* 144 CONG. REC. S6413–14 (daily ed. June 16, 1998) (statement of Sen. Thompson). The statute was framed as a reclamation of the Congress's Appointments Clause power. *See id.* at S6413 ("This legislation is needed to preserve one of the Senate's most important powers: the duty to advise and consent on presidential nominees."); S. REP. NO. 105-250, at 5 (1998) ("If the Constitution's separation of powers is to be maintained, . . . legislation to address the deficiencies in the operation of the current Vacancies Act is necessary. . . . [T]he Senate's confirmation power is being undermined as never before."). After some amendment, the FVRA was enacted in October 1998. *See* Pub. L. No. 105-277, div. C, tit. I, § 151.

The FVRA provides that, in the event of a vacancy in a PAS position, the "first assistant" automatically takes over in an acting capacity. 5 U.S.C. § 3345(a)(1). The President can also choose to appoint a senior employee from the same agency or a PAS officer from another agency to serve as the acting

officer. *Id.* § 3345(a)(3), (a)(2). Generally speaking, an acting officer can serve no longer than 210 days and cannot become the permanent nominee for the position. *See id.* §§ 3346; 3345(b). Moreover, in response to *Doolin*, the FVRA renders actions taken by persons serving in violation of the Act void ab initio. *See id.* § 3348(d)(1)–(2) ("An action taken by any person who is not acting [in compliance with the FVRA] shall have no force or effect" and "may not be ratified."); *see also* 144 CONG. REC. S6414 (explaining that the FVRA "impose[s] a sanction for noncompliance," thereby "[o]verruling several portions of [*Doolin*]"); S. REP. NO. 105-250, at 5 ("The Committee . . . finds that th[e ratification] portion of [*Doolin*] demands legislative response. . . .").

## B. NLRB GENERAL COUNSEL VACANCY

Under the National Labor Relations Act (NLRA), the General Counsel of the NLRB must be appointed by the President with the advice and consent of the Senate. 29 U.S.C. § 153(d). He is primarily responsible for prosecuting ULP cases before the Board. *Id.* Indeed, the Board cannot adjudicate a ULP dispute until the General Counsel decides a charge has merit and issues a formal complaint. *See id.* § 160(b); 29 C.F.R. §§ 102.9, 102.15. To manage the volume of ULP charges filed each year, the General Counsel has delegated his authority to investigate charges and issue complaints to thirty-two regional directors. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 139 (1975) (citing 29 C.F.R. §§ 101.8; 102.10). The General Counsel, however, retains "final authority" over charges and complaints and exercises "general supervision" of the regional directors. 29 U.S.C. § 153(d).

In June 2010, Ronald Meisburg resigned as NLRB General Counsel. The President directed Lafe Solomon,

then–Director of the NLRB's Office of Representation Appeals, to serve as the Acting General Counsel in Meisburg's stead. *See* Memorandum from the White House for Lafe E. Solomon (June 18, 2010). The President cited the FVRA as the authority for Solomon's appointment. *See id.* (invoking "section 3345(a) of title 5"). [2] On January 5, 2011—six months into Solomon's temporary appointment—the President nominated him to be General Counsel. 157 CONG. REC. S69 (daily ed. Jan. 5, 2011). The Senate, however, returned Solomon's nomination. 159 CONG. REC. S17 (daily ed. Jan. 3, 2013). The President resubmitted Solomon's nomination on May 24, 2013, 159 CONG. REC. S3884 (daily ed. May 23, 2013), but ultimately withdrew it and nominated Richard Griffin instead, who was confirmed by the Senate on October 29, 2013. 159 CONG. REC. S7635 (daily ed. Oct. 29, 2013). All told, Solomon served as Acting General Counsel from June 21, 2010 to November 4, 2013.

## C. BOARD PROCEEDINGS AGAINST SOUTHWEST

SW General, Inc. (Southwest) provides ambulance services to hospitals in Arizona. Its emergency medical technicians, nurses and paramedics are represented by the International Association of Fire Fighters Local I-60,

---

[2] The NLRA also authorizes the appointment of a temporary Acting General Counsel. *See* 29 U.S.C. § 153(d); *see also* S. REP. NO. 105-120, at 16 (FVRA does not override appointment provision in NLRA (referencing 5 U.S.C. § 3347(a)(1)(A))). The President did not invoke the NLRA when appointing Solomon, however—perhaps because the FVRA allows an acting officer to serve for a longer period of time. *Compare* 29 U.S.C. § 153(d) (permitting service for 40 days, tolled while nomination is pending before Senate), *with* 5 U.S.C. § 3346 (permitting service for 210 days, tolled while first or second nomination is pending before Senate).

AFL-CIO (Union). The most recent collective bargaining agreement between Southwest and the Union contained a "Longevity Pay" provision, guaranteeing annual bonuses to Southwest employees who had been with the company for at least ten years. In December 2012—after the collective bargaining agreement expired but before the parties negotiated a replacement—Southwest stopped paying the longevity bonuses.

The Union immediately filed a ULP charge with the NLRB. Regional Director Cornele Overstreet issued a formal complaint on January 31, 2013, alleging that Southwest had unilaterally discontinued longevity payments in violation of sections 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(1), (5). After a hearing, an administrative law judge (ALJ) agreed that Southwest had committed a ULP. Southwest filed fifteen exceptions to the ALJ's decision, the second of which challenged the ULP complaint on the ground that Acting General Counsel Solomon was serving in violation of the FVRA. *See* Resp't's Exceptions to ALJ Decision at 1 ¶ 2, No. 28-CA-094176 (Sept. 5, 2013). In May 2014, the NLRB adopted the ALJ's recommended order with only minor modifications, *see* 360 N.L.R.B. No. 109 (2014), and it did not address Southwest's FVRA challenge.

Southwest petitioned this Court for review and the Board cross-petitioned for enforcement. We have jurisdiction pursuant to 29 U.S.C. § 160(f), (e).

## II. ANALYSIS

Southwest maintains that, as of January 2011, Acting General Counsel Solomon was serving in violation of the FVRA and, thus, the ULP complaint issued against it in January 2013 was invalid. Specifically, Southwest argues that Solomon became ineligible to serve as Acting General Counsel

once the President nominated him to be General Counsel. *See* 5 U.S.C. § 3345(b)(1). [3] In its original brief, the Board vigorously contested Southwest's reading of the statute but made no argument—except in a lone footnote—about the *consequences* of an FVRA violation. We therefore asked the parties to submit supplemental briefs addressing whether an FVRA violation, assuming one occurred, would nonetheless be harmless error. With the benefit of the parties' arguments, we now conclude that (A) Solomon was serving in violation of the FVRA when the complaint issued against Southwest and (B) the violation requires us to vacate the Board's order.

## A.

The key provision of the FVRA, for present purposes, is section 3345. For ease of reference, we quote the provision in full:

**§ 3345. Acting officer**

**(a)** If an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the

---

[3] We note that Solomon's nomination was no longer pending when the ULP complaint issued against Southwest: the Senate had returned it and the President had not yet resubmitted it. The Board, however, does not argue that the non-pendency of Solomon's nomination should make a difference in our analysis. We therefore assume it does not.

We also note that the complaint against Southwest was issued by Regional Director Overstreet pursuant to a *delegation* of authority from Solomon. The Board, however, does not argue that this delegation survives any defect in the General Counsel's authority. We, again, assume *arguendo* that it does not.

9

Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—

> **(1)** the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;
>
> **(2)** notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or
>
> **(3)** notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if—
>
>> **(A)** during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and
>>
>> **(B)** the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule.

**(b)(1)** Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if—

> **(A)** during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person—

**(i)** did not serve in the position of first assistant to the office of such officer; or

**(ii)** served in the position of first assistant to the office of such officer for less than 90 days; and

**(B)** the President submits a nomination of such person to the Senate for appointment to such office.

**(2)** Paragraph (1) shall not apply to any person if—

**(A)** such person is serving as the first assistant to the office of an officer described under subsection (a);

**(B)** the office of such first assistant is an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate; and

**(C)** the Senate has approved the appointment of such person to such office.

**(c)(1)** Notwithstanding subsection (a)(1), the President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department without a break in service, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

**(2)** For purposes of this section and sections 3346, 3347, 3348, 3349, 3349a, and 3349d, the expiration of a term of office is an inability to perform the functions and duties of such office.

5 U.S.C. § 3345.

Solomon became Acting General Counsel pursuant to subsection (a)(3)—the senior agency employee provision. As the Director of the Office of Representation Appeals for the previous ten years, Solomon easily met the salary and experience requirements of that subsection. *See id.* § 3345(a)(3)(A)–(B). According to Southwest, however, Solomon could no longer serve as Acting General Counsel once the President nominated him in January 2011 to be General Counsel. Subsection (b)(1) of the FVRA prohibits a person from being both the acting officer and the permanent nominee unless (1) he served as the first assistant to the office in question for at least 90 of the last 365 days or (2) he was confirmed by the Senate to be the first assistant. *See id.* § 3345(b)(1)–(2). Solomon was never a first assistant *at all* so the exceptions plainly do not apply to him. The Board, however, contends that the prohibition in subsection (b)(1) governs only an acting officer who assumes the position pursuant to subsection (a)(1), not an acting officer who is directed to serve by the President pursuant to subsections (a)(2) or (a)(3). Thus, the pivotal question is whether the prohibition in subsection (b)(1) applies to *all* acting officers, as Southwest contends, or just first assistants who become acting officers by virtue of subsection (a)(1), as the Board contends. Considering this question de novo,[4] we think Southwest has

---

[4] The NLRB is not entitled to *Chevron* deference when it interprets the FVRA, "a general statute not committed to [its] administration." *Soc. Sec. Admin. v. FLRA*, 201 F.3d 465, 471 (D.C. Cir. 2000). We also note that, in 1999, the Office of Legal Counsel (OLC) endorsed the NLRB's interpretation of subsection (b)(1). *See* Guidance on Application of Federal Vacancies Reform Act of 1998, 23 Op. O.L.C. 60, 64 (1999) ("The limitation on the ability to be the nominee for the vacant position and to serve as the acting officer applies only to persons who serve as acting officers by virtue of having been the first assistant to the office."). But the

the better argument.[5]

The first independent clause of subsection (b)(1) is the clearest indication of its overall scope. That clause states that "*a person* may not serve as an acting officer for an office under *this section*." 5 U.S.C. § 3345(b)(1) (emphases added). The term "a person" is broad; it covers the full spectrum of possible candidates for acting officer. *See Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 (1978) ("the phrase 'any person' " has a "naturally broad and inclusive meaning"). And the phrase "this section" plainly refers to section 3345 in its entirety. Throughout the FVRA, the Congress was precise in its use of internal cross-references. *See, e.g.*, 5 U.S.C. §§ 3345(b)(2)(A) ("subsection (a)"); 3345(c)(1) ("subsection (a)(1)"); 3345(c)(2) ("this section and sections 3346, 3347, 3348 . . ."); 3345(a)(2)–(3) ("paragraph (1)"); 3348(e) ("this section"). If the Congress had wanted to enact the Board's understanding, it would have said "first assistant" and "that subsection" instead of "a person" and "this section." Thus, the plain language of subsection (b)(1) manifests that no person can serve as both the acting officer and the permanent nominee (unless one of the exceptions in subsections (b)(1)(A) or (b)(2) applies).

---

OLC is not entitled to *Chevron* deference either. *See Crandon v. United States*, 494 U.S. 152, 177 (1990) ("advisory opinion[] . . . of the . . . OLC . . . is not an administrative interpretation that is entitled to deference under *Chevron*").

[5] Our decision is in accord with the two other courts that have considered the question. *See Hooks v. Remington Lodging & Hospitality, LLC*, 8 F. Supp. 3d 1178, 1187–89 (D. Alaska 2014); *Hooks v. Kitsap Tenant Support Servs., Inc.*, No. 13-cv-5470, 2013 WL 4094344, at *2 (W.D. Wash. Aug. 13, 2013).

13

The Board's main argument to the contrary focuses on the first dependent clause in subsection (b)(1): "Notwithstanding subsection (a)(1)." According to the Board, the "notwithstanding" clause limits subsection (b)(1)'s prohibition to first assistants who become acting officers pursuant to subsection (a)(1). There are several flaws with this argument. For starters, it is not what the word "notwithstanding" means. *See Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) ("It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (quotation marks omitted)). "Notwithstanding" means "in spite of," OXFORD ENGLISH DICTIONARY (2d ed. 1989); BLACK'S LAW DICTIONARY (10th ed. 2014)—not, as the Board would have it, "for purposes of" or "with respect to." Here, then, the "notwithstanding" clause means "to the extent that subsection (a)(1) deviates from subsection (b)(1), subsection (b)(1) controls." *See United States v. Fernandez*, 887 F.2d 465, 468 (4th Cir. 1989) (proviso " 'notwithstanding any other provision of law' . . . naturally means that the [statute] should not be limited by other statutes"); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 126 (Thompson/West 2012) ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces . . . derogates from the provision to which it refers."). The Congress likely referenced subsection (a)(1) to clarify that its command—that the first assistant "shall" take over as acting officer—does not supersede the prohibition in subsection (b)(1). But, apart from setting out an order of operations, the "notwithstanding" clause has no significance for the ultimate scope of subsection (b)(1). *See Kucana v. Holder*, 558 U.S. 233, 238–39 n.1 (2010) ("The introductory clause ['Notwithstanding any other provision of law'] does not define the scope of [the statute]. It simply informs that once

the scope of the [statute] is determined, [it applies] regardless of what any *other* provision or source of law might say.").

Context further refutes the Board's "notwithstanding" argument. As discussed, the Board's interpretation of "notwithstanding" is irreconcilable with the breadth of the words "a person" and "this section" in the remainder of the introductory clause. *See Maracich v. Spears*, 133 S. Ct. 2191, 2205 (2013) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."); *cf. also United States v. Emerson*, 270 F.3d 203, 233 n.32 (5th Cir. 2001) ("[W]here the preamble and the operative portion of the statute may reasonably be read consistently with each other, the preamble may not properly support a reading of the operative portion which would plainly be at odds with what otherwise would be its clear meaning."). Indeed, the only other time section 3345 uses the phrase "a person" is in subsection (a)(2) and, there, the phrase is plainly not limited to a first assistant. Moreover, the Congress used the word "notwithstanding" several times in section 3345. *See* 5 U.S.C. §§ 3345(a)(2)–(3) ("notwithstanding paragraph (1)"); 3345(c)(1) ("Notwithstanding subsection (a)(1)" and "notwithstanding adjournment sine die"). Each time, it plainly meant "in spite of" rather than "with respect to." "It is a well established rule of statutory construction that a word is presumed to have the same meaning in all subsections of the same statute." *Allen v. CSX Transp., Inc.*, 22 F.3d 1180, 1182 (D.C. Cir. 1994) (quotation marks omitted). Similarly, the Congress used the phrase "For purposes of" in subsection (c)(2), which shows that it knew how to use limiting language when it wanted to. *See Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007) ("[W]e have repeatedly held that where different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings." (quotation marks and

alteration omitted)). The Board's crabbed interpretation of "notwithstanding" simply does not pass muster.

Further, the Board's reading of subsection (b)(1)—but not Southwest's—renders other provisions of section 3345 superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quotation marks omitted)). In the Board's view, subsection (b)(1) applies only to subsection (a)(1)—the first assistant provision. Although we do not decide its meaning today, subsection (a)(1) may refer to the person who is serving as first assistant *when the vacancy occurs*. *Accord* 23 Op. O.L.C. at 64 ("[W]e believe . . . you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant."). Under this reading, subsection (a)(1) provides a default rule that automatically promotes someone (the current first assistant) to be the acting officer without a break in service and without action by the President. But if subsection (a)(1) refers to the first assistant at the time of the vacancy, then the condition in subsection (b)(1)(A)(i)—that the person "did not serve in the position of first assistant to the office" in the prior 365 days—is inoperative because the current first assistant *necessarily* served as the first assistant in the previous year. If Southwest is correct that subsection (b)(1) applies to all acting officers, however, then subsection (b)(1)(A)(i) is not superfluous because many PAS officers (subsection (a)(2)) and senior agency employees (subsection (a)(3)) will not have served as the first assistant in the prior year.

At oral argument, the Board argued—consistent with a revised OLC opinion—that subsection (a)(1) also applies to a person who becomes first assistant *after* the vacancy occurs.

Oral Arg. Recording 17:02–30:24; *accord* Designation of Acting Associate Attorney General, 25 Op. O.L.C. 177, 179–81 (2001). This interpretation, the Board contends, gives a nonsuperfluous meaning to subsection (b)(1)(A)(i). Yet, the Board's interpretation faces another surplusage problem. Section 3345(b)(2)(A) allows an acting officer to also be the permanent nominee if, *inter alia*, he "is serving as [a] first assistant." But the current first assistant—whether he became first assistant before or after the vacancy—is *necessarily* serving as a first assistant. The Board's interpretation (which reads "person" in subsection (b) to mean "first assistant") creates surplusage whereas Southwest's interpretation (which reads "person" to mean "first assistant, PAS officer or senior agency employee") does not.

Perhaps sensing the weakness of its textual arguments, the Board falls back on legislative history and statutory purpose to support its interpretation. Its argument needs to be quite strong because, to repeat, the text of the FVRA plainly supports Southwest. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."); *Kloeckner v. Solis*, 133 S. Ct. 596, 607 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text."). As we shall see, however, the Board's argument is anything but.

The Board first points to a floor statement by Senator Thompson, the chief sponsor of the FVRA. Thompson presaged the Board's view, stating, "Under § 3345(b)(1), the revised reference to § 3345(a)(1) means that this subsection applies only when the acting officer is the first assistant, and

not when the acting officer is designated by the President pursuant to §§ 3345(a)(2) or 3345(a)(3)." 144 CONG. REC. S12,822 (daily ed. Oct. 21, 1998). Yet, a statement of a single Senator—even the bill's sponsor—is only weak evidence of congressional intent. *See Zuber v. Allen*, 396 U.S. 168, 186 (1969) ("Floor debates reflect at best the understanding of individual Congressmen."); *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."). Moreover, Thompson was immediately contradicted by Senator Byrd—an "original sponsor" of the FVRA. 144 CONG. REC. S12,824 (statement of Sen. Byrd). Byrd's statement[6] hewed much more closely to the statutory text and suggested that subsection (b)(1) applies to all categories of acting officers. Thus, the floor statements are a wash. *See March v. United States*, 506 F.2d 1306, 1314 n.31 (D.C. Cir. 1974) ("[W]here, as here, [congressional debates] reflect individual interpretations that are contradictory and ambiguous, they carry no probative weight."). And Senator Thompson's statement is certainly not enough to overcome the FVRA's clear text. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 12 (D.C. Cir. 2009) ("Floor statements from members of Congress, even from a bill's sponsors, cannot amend the

---

[6] "[T]he officer's position may . . . be filled temporarily by either: (1) the first assistant to the vacant office; (2) an executive officer who has been confirmed by the Senate for his current position; or (3) a career civil servant, paid at or above the GS-15 rate, who has served in the agency for at least 90 of the past 365 days. However, *a person* may not serve as an acting officer if: (1)(a) *he is not the first assistant*, or (b) he has been the first assistant for less than 90 of the past 365 days, and has not been confirmed for the position; and (2), the President nominates him to fill the vacant office." 144 CONG. REC. S12,824 (emphases added).

clear and unambiguous language of a statute." (quotation marks omitted)).

The Board next cites a Senate committee report to buttress its interpretation. The report states that "a *first assistant* who has not received Senate confirmation, but who is nominated to fill the office permanently, can be made the acting officer only if he has been the first assistant for at least 180 days in the year preceding the vacancy." S. REP. NO. 105-250, at 2 (emphasis added). The committee report, however, is inapposite because it discusses a *different version* of the FVRA from the one ultimately enacted. Specifically, an earlier draft of subsection (b) provided:

> **(b)** Notwithstanding section 3346(a)(2), a person may not serve as an acting officer for an office under this section, if–
>> **(1)** on the date of the death, resignation, or beginning of inability to server of the applicable officer, such person serves *in the position of first assistant* to such officer;
>> **(2)** during the 365-day period preceding such date, such person served *in the position of first assistant* to such officer for less than 180 days; and
>> **(3)** the President submits a nomination of such person to the Senate for appointment to such office.

*Id.* at 25 (emphases added). This version of subsection (b) manifestly applies to first assistants only. But the version ultimately enacted looks quite different. In fact, the change in phraseology weighs somewhat *against* the Board's interpretation. *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1289 (D.C. Cir. 2000) ("The fact that Congress

specifically rejected language favorable to [a party's] position and enacted instead language that is consistent with [the opponent's] interpretation only strengthens our conclusion that the [opponent] has correctly ascertained Congress' intent . . . .").

Finally, the Board contends that Southwest's interpretation of subsection (b)(1) defeats the purpose behind subsections (a)(2) and (a)(3): namely, "expanding the pool of potential acting officers beyond first assistants." Resp't's Br. 38. But accepting Southwest's interpretation in no way decreases the pool of people eligible to be an acting officer; it merely decreases the pool of people eligible to be both the acting officer *and* the permanent nominee.

In short, the text of subsection (b)(1) squarely supports Southwest's interpretation and neither the legislative history nor the purported goal of the FVRA helps the Board. We therefore hold that the prohibition in subsection (b)(1) applies to all acting officers, no matter whether they serve pursuant to subsection (a)(1), (a)(2) or (a)(3). Because Solomon was never a first assistant and the President nominated him to be General Counsel on January 5, 2011, the FVRA prohibited him from serving as Acting General Counsel from that date forward.

## B.

Having concluded that Solomon was serving in violation of the FVRA when the ULP complaint issued against Southwest, we must now determine the consequence of that violation. Southwest believes we *must* vacate the Board's order. If the violation had occurred in the typical federal office, we might agree. The FVRA renders any action taken in violation of the statute void ab initio: section 3348(d) declares that "[a]n action taken by any person who is not acting

[in compliance with the FVRA] shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d)(1)–(2). Moreover, without a valid complaint, the Board could not find Southwest liable for a ULP. *See* 29 U.S.C. § 160(b) (requiring complaints); *NLRB v. Dant*, 344 U.S. 375, 382 (1953) ("[T]he remedial processes of the [NLRA] to cure [unfair labor] practices . . . can only be invoked by the issuance of a complaint."); *NLRB v. Highland Park Mfg. Co.*, 341 U.S. 322, 325 (1951) ("The Board is a statutory agency, and, when it is forbidden to investigate or entertain complaints in certain circumstances, its final order could hardly be valid.").

But this is not the typical case. Section 3348(e)(1) exempts "the General Counsel of the National Labor Relations Board" from the provisions of "section [3348]," including the void-ab-initio and no-ratification rules. *See* 5 U.S.C. § 3348(e)(1).[7] The Board contends that section 3348(e)(1)

---

[7] According to a Senate committee report, section 3348(e) was intended to exempt the General Counsel of the NLRB from "the vacant office provisions" of the FVRA. S. REP. NO. 105-250, at 20. The vacant office provision is section 3348(b), which provides that, absent compliance with the FVRA, an office must "remain vacant" and "only the head of [the] Executive agency may perform any function or duty of such office." 5 U.S.C. § 3348(b)(1)–(2). The Congress did not want the "head" of the NLRB—*i.e.*, the Board members—to perform the duties of the General Counsel because the NLRA intentionally "separate[s] the official who . . . investigate[s] and charge[s] [ULPs] from the officials who . . . determine whether th[e] statute ha[s] actually been violated." S. REP. NO. 105-250, at 20; *see also Haleston Drug Stores v. NLRB*, 187 F.2d 418, 421 n.3 (9th Cir. 1951). "If the non-delegable duties of the[] general counsel were somehow to be performed by the [Board members] that policy would be obliterated." S. REP. NO. 105-250, at 20. This explains why the Congress exempted the General Counsel from *section 3348(b)* but we are unsure why the Congress also exempted

allows it to raise arguments like harmless error and the de facto officer doctrine. *See generally* 5 U.S.C. § 706 (in reviewing agency action, "due account shall be taken of the rule of prejudicial error"); *Doolin*, 139 F.3d at 212–14. We therefore assume that section 3348(e)(1) renders the actions of an improperly serving Acting General Counsel *voidable*, not void, and consider the two arguments the Board posits in its supplemental brief. We express no view on whether section 3348(e)(1) could be understood more broadly to wholly insulate the Acting General Counsel's actions even in the event of an FVRA violation. We similarly express no view on defenses the Board never raised. *See United States v. Hasting*, 461 U.S. 499, 510 (1983) ("[W]e are not required to review records to evaluate a harmless error claim, and do so sparingly.").

### i. Harmless Error

We first address the "rule of prejudicial error." 5 U.S.C. § 706. As previously discussed, we held in *Doolin* that any statutory defect in the acting director's authority was cured because a subsequent, properly appointed director ratified his actions. *See* 139 F.3d at 213. The Board does not rely on *Doolin*'s holding—understandably, inasmuch as no properly appointed General Counsel ratified the ULP complaint against Southwest. *See generally FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98–99 (1994). The Board instead relies on a paragraph of dicta from *Doolin*. In *Doolin*, we analogized a complaint in an administrative enforcement proceeding to a grand jury indictment in a criminal proceeding. *See* 139 F.3d at 212. Defects in a grand jury indictment do not constitute reversible error, *Doolin* noted, unless they "prejudiced" the

---

the General Counsel from *section 3348(d)* (*i.e.*, the no-ratification and void-ab-initio provisions).

defendant. *Id.* (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)). And a defect does not prejudice the defendant if a petit jury subsequently finds him guilty beyond a reasonable doubt. *Id.* (citing *United States v. Mechanik*, 475 U.S. 66, 73 (1986)). The same logic might apply, we postulated in *Doolin*, if an agency adjudicator finds a petitioner liable despite a defective administrative complaint. *See id.* *Doolin* ultimately declined to rely on this hypothesis, however, because the parties had not briefed it. *See id.* Here, on the other hand, the Board brings *Doolin*'s dicta to the forefront and argues that the NLRB's final order renders harmless any defect in the ULP complaint against Southwest.

The grand jury analogy in *Doolin*, like the doctrine of harmless error generally, focuses on the existence *vel non* of "prejudice[]" to the petitioner. *Id.* But a petitioner need not demonstrate prejudice in the first place if the alleged error is "structural" in nature. *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000). In the grand jury context, for example, the occurrence of race or sex discrimination in the selection of grand jurors constitutes a structural error that warrants automatic reversal. *See id.* at 1130–31 (citing *Vasquez v. Hillery*, 474 U.S. 254, 261 & n.4 (1986) (race); *Ballard v. United States*, 329 U.S. 187, 195 (1946) (sex)). In the agency context, we concluded in *Landry* that "[i]ssues of separation of powers" are structural errors that do not require a showing of prejudice because "it will often be difficult or impossible for someone subject to a wrongly designed scheme to show that the design—the structure—played a causal role in his loss." *Id.* at 1131. "[D]emand for a clear causal link to a party's harm" would frustrate the " 'prophylactic' " goal of the separation of powers—*i.e.*, " 'establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict.' " *Id.* (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239

(1995)). *Landry* rejected the argument that subsequent de novo review by the Federal Deposit Insurance Commission could render harmless the fact that the ALJ was serving in violation of the Appointments Clause. *See id.* at 1130–32. "If the process of final de novo review could cleanse the violation of its harmful impact," *Landry* reasoned, "then all such arrangements would escape judicial review." *Id.* at 1132.

Southwest contends that an FVRA violation is a structural error that cannot be rendered harmless by subsequent de novo review. We do not reach that question, however, because we agree with another one of Southwest's arguments. Specifically, the grand jury analogy from *Doolin* is ill-suited in this case. In a criminal proceeding, the grand jury and petit jury are similarly situated and have the same basic task: determining the defendant's guilt under the requisite standard of proof ("probable cause" and "beyond a reasonable doubt," respectively). *See Mechanik*, 475 U.S. at 70. As such, "[a] later conviction by a petit jury supplies *virtual certainty* that a properly constituted grand jury would have indicted." *Landry*, 204 F.3d at 1131 (emphasis added). Here, however, we lack the same certainty. The NLRB General Counsel is statutorily independent from the Board, *see NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 124 (1987); *Sears, Roebuck*, 421 U.S. at 138–39, and he has "final authority" over the issuance of ULP complaints, 29 U.S.C. § 153(d); *see also United Food*, 484 U.S. at 126 (General Counsel has "unreviewable discretion to file and withdraw a complaint"). He essentially exercises prosecutorial discretion: he need not issue a complaint even if he believes a ULP was committed. *See United Food*, 484 U.S. at 126, 130. Moreover, the General Counsel sets the enforcement priorities for the NLRB and generally supervises its lawyers. *See* 29 U.S.C. § 153(d); *Sears, Roebuck*, 421 U.S.

at 138–42. During oral argument, the Board conceded that, if the General Counsel's office were vacant, the NLRB "would not be issuing complaints." Oral Arg. Recording 32:51–32:57. The Board nonetheless argued that, because the type of ULP charged against Southwest was not "of substantial legal interest" to Acting General Counsel Solomon, that particular complaint did not require submission to the General Counsel's Office for review beforehand. *Id.* at 32:06–32:51. Southwest rightly points out, however, that a different General Counsel may have imposed different requirements and procedures during his tenure. *See, e.g.*, Memorandum GC 11-11 from Acting Gen. Counsel Lafe Solomon to All Reg'l Dirs., Officers-in-Charge, and Resident Officers 1 (Apr. 12, 2011) (identifying four "groups" of matters that must be submitted to General Counsel for advice, including those that "involve a policy issue in which I am particularly interested" and "involve issues as to which the law is in flux as the result of Board or court decisions"). Accordingly, notwithstanding the final Board order, we cannot be confident that the complaint against Southwest would have issued under an Acting General Counsel other than Solomon. *See Haleston Drug Stores*, 187 F.2d at 422 n.5 ("[O]scillations in rigor are characteristic of prosecuting officers."). Our uncertainty is sufficient to conclude that Southwest has carried its burden of demonstrating that the FVRA violation is non-harmless under the Administrative Procedure Act. *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 n.5 (D.C. Cir. 2010) (although "[t]he burden to demonstrate prejudicial error is on the party challenging agency action," it "is not a particularly onerous requirement" (quotation marks and ellipsis omitted)). We therefore conclude that the NLRB order did not ratify or otherwise render harmless the FVRA defect in the ULP complaint against Southwest. We note, however, that our conclusion does not control whether the

ineligibility of an official with prosecutorial responsibilities in other contexts should be considered harmless.

## ii. De Facto Officer Doctrine

The only other argument in the Board's supplemental brief is the de facto officer doctrine. This oft-forgotten doctrine has "feudal origins," dating back to the 15th century. *Andrade v. Lauer*, 729 F.2d 1475, 1496 (D.C. Cir. 1984); *see also* Note, *The De Facto Officer Doctrine*, 63 COLUM. L. REV. 909, 909 n.1 (1963) ("The first reported case to discuss the concept of *de facto* authority was The Abbe of Fountaine, 9 Hen. VI, at 32(3) (1431)."). The doctrine "confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Ryder v. United States*, 515 U.S. 177, 180 (1995). In its most recent cases, however, the Supreme Court has limited the doctrine, declining to apply it when reviewing Appointments Clause challenges, *see id.* at 182–83, and important statutory defects to an adjudicator's authority, *see Nguyen v. United States*, 539 U.S. 69, 78 (2003).

In its traditional form, the de facto officer doctrine distinguishes between "direct" and "collateral" attacks on an officer's authority. *Andrade*, 729 F.2d at 1496. A collateral attack challenges "government *action* on the ground that the officials who took the action were improperly in office." *Id.* (emphasis added). The de facto officer doctrine bars such attacks. *Id.* A direct attack, by contrast, challenges "the *qualifications* of the officer, rather than the actions taken by the officer." *Id.* (emphasis added). The de facto officer doctrine allows such attacks but they can be brought via writ of quo warranto only. *Id.* at 1496–97. To obtain quo warranto against a federal official, an interested party must petition the

Attorney General of the United States to institute a proceeding in federal district court. D.C. CODE §§ 16-3501–02. If the Attorney General declines, the interested party can petition the court to issue the writ instead. D.C. CODE § 16-3503. Both the Attorney General and the court, however, have "broad discretion" to decline to make use of quo warranto. *Andrade*, 729 F.2d at 1498.

This Court has rejected the traditional version of the de facto officer doctrine. *See id.* at 1498–99. Direct action via quo warranto is too "cumbersome," we explained in *Andrade*, and "could easily operate to deprive a plaintiff with an otherwise legitimate claim of the opportunity to have his case heard." *Id.* at 1498. We disapprove of any "interpretation of the de facto officer doctrine that . . . would render legal norms concerning appointment and eligibility to hold office unenforceable." *Id.* Instead, we have held that collateral attacks on an official's authority are permissible when two requirements are satisfied:

> First, the plaintiff must bring his action at or around the time that the challenged government action is taken. Second, the plaintiff must show that the agency or department involved has had reasonable notice under all the circumstances of the claimed defect in the official's title to office.

*Id.* at 1499. Both requirements are met here.

The first requirement, as stated in *Andrade*, appears on its face not to fit this case. The plaintiffs in *Andrade* filed a separate suit for injunctive and declaratory relief, *id.* at 1479, which explains the Court's instruction to "*bring* [an] *action* at or around the time the challenged government action is taken," *id.* at 1499 (emphases added). Here, by contrast, Southwest is subject to an enforcement action brought *by the NLRB*. In

these circumstances, we have held, a party satisfies the first *Andrade* requirement if it challenges an officer's authority as a *defense* to the enforcement action. *See FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C. Cir. 1993). Of course, the ordinary rules of exhaustion and forfeiture still apply. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 707 (D.C. Cir. 1996). In the administrative proceedings below, Southwest raised its FVRA challenge as an exception to the ALJ decision. It therefore complied with the NLRA's jurisdictional exhaustion requirement. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court," absent "extraordinary circumstances"); *id.* at § 160(f) (incorporating § 160(e)); *see also Trump Plaza Associates v. NLRB*, 679 F.3d 822, 829 (D.C. Cir. 2012) ("Cases interpreting section 10(e) look to whether a party's exceptions are sufficiently specific to apprise the Board that an issue might be pursued on appeal."). And the Board does not assert that Southwest's challenge was otherwise untimely or forfeited. Thus, we assume it was properly preserved.

Nor does the Board contest that the second *Andrade* requirement—notice—is also satisfied here. To meet this requirement, "the agency . . . [must] actually know[] of the claimed defect." *Andrade*, 729 F.2d at 1499. Notice ensures that the agency has a chance to "remedy any defects (especially narrowly technical defects) either before it permits invalidly appointed officials to act or shortly thereafter." *Id.*; *see also Wilkinson v. Legal Services Corp.*, 80 F.3d 535, 538 (D.C. Cir. 1996). Here, Southwest notified the NLRB of the defect in Solomon's authority by excepting to the ALJ decision. *See Andrade v. Regnery*, 824 F.2d 1253, 1256 (D.C. Cir. 1987) ("The filing of the underlying suit . . . in and of itself notified the government of appellants' . . . challenge."). The Board

does not challenge the adequacy of this notice. Moreover, the notice requirement is satisfied if the agency learns of the defect from *any* source, not only the petitioner. *See Andrade*, 729 F.2d at 1499 ("[We] do[] not require . . . that the agency's knowledge of the alleged defect must come from the plaintiff."). The Board has not informed us when it first became aware of Solomon's problematic service. We therefore cannot say that its notice of the FVRA defect was inadequate. Accordingly, we conclude that the de facto officer doctrine does not bar Southwest from challenging Solomon's authority.

Finally, we emphasize the narrowness of our decision. We hold that the former Acting General Counsel of the NLRB, Lafe Solomon, served in violation of the FVRA from January 5, 2011 to November 4, 2013. But this case is not Son of *Noel Canning*[8] and we do not expect it to retroactively undermine a host of NLRB decisions. We address the FVRA objection in this case because the petitioner raised the issue in its exceptions to the ALJ decision as a defense to an ongoing enforcement proceeding. We doubt that an employer that failed to timely raise an FVRA objection—regardless whether enforcement proceedings are ongoing or concluded—will enjoy the same success. *See* 29 U.S.C. § 160(e); *Andrade*, 729 F.2d at 1499.

For the foregoing reasons, we grant the petition for review, deny the cross-application for enforcement and vacate the NLRB order.

*So ordered.*

---

[8] *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), *aff'd*, 134 S. Ct. 2550 (2014).