# United States Court of Appeals
## For the First Circuit

---

No. 04-2071

SOCIEDAD ESPAÑOLA DE AUXILIO MUTUO Y BENEFICIENCIA DE P.R.
A/K/A HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO, INC.,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

---

PETITION FOR REVIEW OF AN ORDER OF

THE NATIONAL LABOR RELATIONS BOARD

---

Before

Selya, <u>Circuit Judge</u>,
Baldock,[*] <u>Senior Circuit Judge</u>,
and Howard, <u>Circuit Judge</u>.

---

<u>Julio I. Lugo Muñoz</u>, with whom <u>Lespier, Muñoz Noya & Rivera</u>
was on brief, for petitioner.
<u>William M. Bernstein</u>, Senior Attorney, with whom <u>Arthur F.
Rosenfeld</u>, General Counsel, <u>John E. Higgins, Jr.</u>, Deputy General
Counsel, <u>John H. Ferguson</u>, Associate General Counsel, and <u>Aileen A.
Armstrong</u>, Deputy Associate General Counsel, were on brief, for
respondent.

---

July 8, 2005

---

[*]Of the Tenth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**. In this case, we consider a petition for review and cross-petition for enforcement of an order of the National Labor Relations Board. The order charged the petitioner, Sociedad Española de Auxilio Mutuo Y Benficencia de Puerto Rico (Hospital), with four unfair labor practices under the National Labor Relations Act, 29 U.S.C. § 151 et seq., for its dealings with the Unidad Laboral de Enfermeras y Empleados de la Salud (Union). The Hospital challenges the Board's ruling on each alleged violation. We enforce the Board's order.

## I.  Procedural Background

The Hospital is a tertiary care institution located in San Juan, Puerto Rico. The Union has been the certified representative of the Hospital's registered nurses since 1977. In December 1994, 150 technical employees, including respiratory therapists and radiology technicians, voted to join the Union. The Hospital filed objections to the election, but the Board certified the Union as the representative of these employees in January 1997. Approximately eighteen months later, collective bargaining began with the technical employees.

In December 1999, the NLRB General Counsel filed a complaint against the Hospital alleging that it had committed five unfair labor practices. The complaint alleged that the Hospital had (1) unlawfully enforced a no-solicitation/no-distribution policy against a unionized employee; (2) told employees it was

-2-

going to lock them out in retaliation for their union activities; (3) sought to encourage employees to decertify the Union; (4) fired an employee for her union activities; and (5) subcontracted union work without providing prior notice to the Union and without affording the Union the opportunity to bargain over the subcontracting decision.

In October 2000, an administrative law judge (ALJ) held a six-day hearing on these allegations. Just over a year later, the ALJ issued an opinion and order finding that the Hospital had committed all five of the alleged unfair labor practices. The Hospital filed exceptions with the Board as to each finding. The Board affirmed the ALJ's ruling except for the finding concerning the Hospital's threat to lock out its employees. Thus, the final Board order found that the Hospital had committed unfair labor practices concerning its termination of an employee, its unlawful enforcement of a no-solicitation policy, its effort to decertify the Union, and its subcontracting of Union work. The Hospital timely petitioned for review in this court, and the General Counsel cross-petitioned for enforcement of the Board's order.

## II. Standard of Review

The case turns primarily on whether the facts in the record support the Board's determinations. We are required to accept the Board's factual findings so long as they are "supported by substantial evidence on the record considered as a whole." 29

U.S.C. § 160(e); NLRB v. Hosp. San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." NLRB v. Beverly Enterprises-Mass., Inc., 174 F.3d 13, 21 (1st Cir. 1999). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the Board's] finding from being supported by substantial evidence." American Textile Mfrs. v. Donovan, 452 U.S. 490, 523 (1981). The ultimate question is "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998).

### III. Discussion

#### A.    Discharge of Elsa Romero

We begin by considering the Board's finding that the Hospital violated section 8(a)(3) of the Act by firing Elsa Romero, a respiratory therapist, because of her union activities. See 29 U.S.C. § 158(a)(3). The Hospital claims that the Board's decision is not supported by substantial evidence because the proof was overwhelming that the Hospital terminated Romero because of her failure to follow Hospital rules.

"An employer violates section 8(a)(3) by punishing an employee for engaging in pro-union or other protected activities." E.C. Waste, Inc. v. NLRB, 359 F.3d 36, 41 (1st Cir. 2004). But an employer is free to terminate a union enthusiast so long as it

-4-

applies its usual disciplinary standards and procedures. See Wright Line v. NLRB, 662 F.2d 899, 901 (1st Cir. 1981). "Whether or not a particular dismissal crosses the line typically depends on the employer's motive." E.C. Waste, 359 F.3d at 41.

The Board and courts have applied a burden-shifting approach in evaluating whether a particular termination violates section 8(a)(3). Under this approach, the General Counsel must first establish a prima facie case by demonstrating (i) the employee's engagement in protected activity, (ii) the employer's knowledge of that activity, (iii) that the employer harbored animus toward unions, and (iv) a causal link between the anti-union animus and the termination. See Hosp. San Pablo, 207 F.3d at 71.

If the General Counsel meets this initial burden, the burden shifts to the employer to prove, by a preponderance of the evidence, that it would have followed the same course of action in the absence of the employee's union activities. See E.C. Waste, 359 F.3d at 42. Importantly, "even if the employer proffers a seemingly plausible explanation, . . . the Board does not have to accept it at face value. If the Board supportably finds that the reasons advanced by the employer are either inadequate or pretextual the violation is deemed proven." Id.

The Hospital has not challenged the Board's finding that the General Counsel established the prima facie case so we will focus primarily on the evidence concerning the Hospital's claim

that it fired Romero for cause. Romero was hired by the Hospital as a respiratory therapist in 1995. She was an active Union member. She served as shop steward and was a member of the Union's collective bargaining committee. During the course of her employment, her supervisor, Carmen Martinez (Supervisor Martinez), told Romero that she should be less visible in demonstrating her support for the Union by limiting her press exposure as a Union supporter. The ALJ characterized this statement as a "veiled threat" that Romero should curtail her union activities or possibly suffer adverse employment consequences. Nevertheless, in December 1997, Romero was rated as an excellent employee and received a 3.9 out of a possible 4.0 on her year-end evaluation.

Ten months later, Romero was fired. The termination letter, dated October 26, 1998, charged Romero with falsely claiming that she performed respiratory therapies on two patients during the night of October 18, 1998. It also cited two reports of Romero's insubordinate behavior subsequent to the October 18th incident and referenced a previous disciplinary charge against Romero dating to mid-1997.

On October 18th, Romero had reported to work for the 3 p.m. to 11 p.m. shift. There was a shortage of respiratory therapists that evening so the supervisor on duty, Minerva Ruiz, asked Romero to arrange for the coverage of additional patients. Romero coordinated with fellow therapist Janice Martinez (Therapist

-6-

Martinez) to cover the additional workload. Romero agreed that she would treat the patients in rooms 275-335.

Romero testified that she followed the established practices in performing her duties that evening. For each patient, she read the medical orders, performed the prescribed therapy, and then returned to the nurse's station, where she recorded the therapy in a log called the "Respiratory Therapy Care Notes." Romero testified that among her patients on the night of October 18th were the two patients occupying room 292. Romero stated that she recorded the therapy for one of the patients on the patient's notes from the prior day and, for the other patient, she recorded the therapy on a blank page in the patient's notes instead of on the page reserved for the October 18th treatments. Both Romero and Supervisor Martinez agreed that, ideally, a therapist recorded the therapies chronologically, but that the alternative recording procedures described by Romero were commonplace.

On October 21, 1998, Supervisor Martinez noticed that both Romero and Therapist Martinez claimed to have performed identical services for the patients in room 292. Doubting that both employees had performed the same services on a single shift, Supervisor Martinez questioned Romero and Therapist Martinez about the duplicate entries. Both employees claimed that they had performed the services.

To investigate the issue, Supervisor Martinez went to the notes for the patients in room 292 and observed that Therapist Martinez had recorded that she had performed the services in the spaces reserved for October 18th. Supervisor Martinez did not, however, review the remaining portions of the notes for these patients to see if Romero had recorded the therapy in another spot.

After reviewing the October 18th entries, Supervisor Martinez again confronted Romero, who reiterated that she had performed the services on the patients in room 292. At this encounter, Supervisor Martinez did not ask Romero where she had recorded the therapies. Nor did she interview any of the other employees on duty on October 18th to ascertain who had performed the therapies on the patients in room 292.

As mentioned above, in addition to the October 18th incident, Romero's termination letter referenced Romero's insubordinate behavior subsequent to October 18th -- reports by a nurse and shift coordinator claiming that Romero had acted disrespectfully toward coworkers and superiors. Supervisor Martinez admitted that she did not investigate either claim. The termination letter also cited a suspension that Romero received in mid-1997 for having another employee punch her time card.

On these facts, the Board determined that Romero's termination was unlawful. The Board found that Supervisor Martinez's investigations were inadequate. It concluded that

-8-

Supervisor Martinez's failure to investigate thoroughly the charges against Romero evidenced a rush to judgment motivated by anti-union animus. It also concluded that the Hospital's reliance on a stale disciplinary charge to justify the termination evidenced pretext. The Hospital takes issue with the Board's conclusion that Supervisor Martinez's conduct was improper and that it was wrong for the Hospital to rely on the mid-1997 suspension as a basis for firing Romero.

The conducting of an inadequate investigation of (or a complete failure to investigate) the incident upon which the employer relied as grounds for discharge can support a finding of discriminatory motive. See, e.g., Cumberland Farms, Inc. v. NLRB, 984 F.2d 556, 560 (1st Cir. 1993). Whether a particular investigation was sufficiently slipshod to support an inference of discrimination is reviewed under the substantial evidence standard. See Valmont Indus., Inc. v. NLRB, 244 F.3d 454, 466 (5th Cir. 2001).

Supervisor Martinez did not entirely ignore her obligation to investigate the October 18th incident. She did talk to the individuals directly involved in the incident and looked at the most pertinent records. The Board concluded, however, that an adequate investigation would have included a more detailed interview with Romero, a more thorough investigation of the paper record, and conversations with employees who may have had knowledge

about the incident. Were we the initial factfinders, we might view the adequacy of this investigation differently. But we are only reviewing for substantial evidence, and on this record, we cannot say that the Board's conclusion was beyond reason. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1957) (stating that Board determination is entitled to affirmance "even though the court would justifiably have made a different choice had the matter been before it de novo").

In any event, the Board's conclusion is substantially reinforced by the other reasons offered by the Hospital for Romero's discharge. Supervisor Martinez conducted no investigation into the charges of insubordination leveled against Romero and did not even ask Romero for her position on the allegations. The Hospital's reliance on completely uninvestigated charges to support a termination suggests that the reasons given were pretextual. See W.W. Grainger, Inc. v. NLRB, 582 F.2d 1118, 1121 (7th Cir. 1978).

Moreover, the Board was reasonable in concluding that the Hospital's reliance on Romero's year-old suspension was probative of pretext. See NLRB v. Q-1 Motor Express, Inc., 25 F.3d 473, 478 (7th Cir. 1994) (finding substantial evidence of discrimination based in part on the employer's reliance on "stale" charges). Not only was the violation over a year old, but it predated Romero's outstanding 1997 performance evaluation. Cf. NLRB v. Hale

Container Line, Inc., 943 F.2d 394, 400 (4th Cir. 1991) (affirming Board finding that an employee's termination was pretextual where the rationale offered by the employer was inconsistent with its recent exemplary evaluation of the employee's performance). The Hospital claims that it relied on this conduct because it favored progressive discipline (i.e., increasing the severity of discipline for each rules infraction). But, as the ALJ observed, the Hospital "produced no evidence to show that it maintains and follows a system of progressive discipline for its employees."

In sum, there was proof that Romero was a union activist and that Supervisor Martinez harbored animus against her because of her union activities. There also was proof that Supervisor Martinez discharged Romero based on superficially investigated and uninvestigated charges, and on a stale infraction that predated Romero's recent outstanding performance evaluation. On these facts, the Board's conclusion that Romero's termination violated section 8(a)(3) is supported by substantial evidence.

### B. Efforts to Decertify the Union

The Hospital's next challenge concerns the effort by a Hospital supervisor to encourage employees to decertify the Union. The Board has interpreted the Act to prevent an employer from lending employees more than "ministerial aid" in their efforts to file a decertification petition against a union. See Eastern States Optical Co., 275 NLRB 371, 372 (1985); accord V&S ProGLAV,

-11-

Inc. v. NLRB, 168 F.3d 270, 276 (6th Cir. 1999); NLRB v. United Union Roofers, Local No. 81, 915 F.2d 508, 512 n.6 (9th Cir. 1990).

The Board found that the Hospital violated this prohibition. The ALJ and the Board both credited the testimony of Barbara Feliciano, a hospital employee and Union member. She testified that, in the winter of 1999, she attended a meeting in which a Hospital supervisor, Blanca Hernandez, explained to several employees the procedure for decertifying the Union. Hernandez also told the employees that they should sign the decertification petition because they had lost benefits while unionized and that if they decertified the Union, the Hospital would be able to give them raises. Feliciano further testified that, after the meeting, Hernandez called her into her office and asked her to sign a paper containing a list of other employees who wanted to decertify the Union. Hernandez denied that either of these meetings took place, but the ALJ found her testimony incredible and the Board did not disturb that finding.

The Hospital does not claim that Hernandez's conduct constituted permissible "ministerial aid," even though the parameters of this standard are not entirely clear. See Catherine Meeker, Defining "Ministerial Aid": Union Decertification Under the National Labor Relations Act, 66 U. Chi. L. Rev. 999 (1999); see also Vic Koenig Chevrolet Inc. v. NLRB, 126 F.3d 947, 949 (7th Cir. 1997). Rather, it simply contends that the Board should have

-12-

credited Hernandez's testimony.  But it is a fundamental principle that, absent a showing that "the ALJ overstepped the bounds of reason," we will not disturb the ALJ's credibility determinations. Ryan Iron Works, Inc. v. NLRB, 257 F.3d 1, 7 (1st Cir. 2001).  The Hospital has not come close to meeting this standard.  The conclusion that the Hospital violated the Act by encouraging employees to decertify the Union is supported by substantial evidence.

### C.        Enforcement of the No-Solicitation Rule

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join or assist labor organizations, [and] to bargain collectively through representatives of their own choosing."  29 U.S.C. § 157.  Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to interfere with an employee's exercise of her section 7 rights.  Id. §  158(a)(1).

The Supreme Court has long held that the right of employees to communicate with one another regarding self-organization at the job site is protected by Section 7. See Republic Aviation Corp. v. NLRB,  324 U.S. 793, 798-99 (1945). This right to communicate encompasses the right to distribute union literature.   Eastex, Inc. v. NLRB, 437 U.S. 556, 572-74 (1978).  The Court has affirmed this right in the hospital setting. See Beth Israel Hosp. v. NLRB, 437 U.S. 483, 507 (1977) (holding that a hospital violates Section 8(a)(1) by preventing an employee

-13-

from distributing union materials "during nonworking time in nonworking areas, where the facility has not justified the prohibition as necessary to avoid disruption of health-care operations or disturbance of the patients").

The Board credited the testimony of Ana Melendez, a hospital employee for over 25 years and the Union president. Melendez testified that sometime in February 1998, she entered the Hospital cafeteria for her lunch break and began to distribute union literature. Shortly thereafter, a hospital security guard intervened and prevented her from continuing. Based on this testimony, the Board concluded that the Hospital violated section 8(a)(1) by restraining Melendez from distributing union material on her nonwork time in a nonwork area. See Poly-America, Inc. v. NLRB, 260 F.3d 465, 483 (5th Cir. 2001) (affirming unfair labor practice based on security guard prohibiting employee from distributing union literature). The Board's view is amply supported by the record.

The Hospital attempts to defeat the Board's conclusion by emphasizing that the Hospital disciplined Melendez for this incident because of her conduct in addressing supervisors after the encounter with the security guard. The Hospital asserts that she was not subject to any discipline for attempting to distribute Union material in the cafeteria. This argument entirely misses the point. The unfair labor practice charged the Hospital with

interfering with Melendez's right to distribute literature based on the security guard's conduct. The claim before us has nothing to do with whatever discipline Melendez received for her conduct <u>after</u> the Hospital violated her section 7 rights.

**D.        Subcontracting Union Work**

The final issue concerns the Hospital's subcontracting of union work. Under section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), an employer has a duty to bargain to impasse with its employees over the terms and conditions of employment before making a unilateral change in conditions. <u>See</u> <u>Litton Fin. Printing Div.</u> v. <u>NLRB</u>, 501 U.S. 190, 198 (1991). The Supreme Court has held that, in some cases, this requirement includes an employer's decision to subcontract work that could be performed by members of the bargaining unit. <u>See</u> <u>Fibreboard Paper Prods. Corp.</u> v. <u>NLRB</u>, 379 U.S. 203, 209-17 (1964). Failure to bargain over subcontracting in such circumstances violates sections 8(a)(1) and 8(a)(5) of the Act. <u>See</u> <u>Automatic Sprinkler Corp. of Am.</u> v. <u>NLRB</u>, 120 F.3d 612, 616 (6th Cir. 1997).

The relevant facts are as follows. From August 1996 until the end of 2000, the Hospital subcontracted radiology technician work from the night, weekend, and holiday shifts to a company called GK Professional Services. Similarly, beginning in 1998, the Hospital subcontracted certain respiratory care work to outside contractors for these same shifts. There is no dispute

-15-

that the subcontracted work was identical to work performed by members of the bargaining unit. The Hospital did not notify the Union of its decision to subcontract this work. Nor did it provide the Union with an opportunity to bargain over the subcontracting decisions or their effects. The Board concluded that this was a violation of the Hospital's duty to notify and bargain with the Union before deciding to subcontract the radiology technician and respiratory therapy work. See Torrington Indus., 307 NLRB 809 (1992) (holding that employer unlawfully subcontracted work unilaterally where the subcontracting involved nothing more than the substitution of one group of workers for another to perform the same work and does not constitute a change in the scope, nature, and direction of the enterprise).

Citing Westinghouse Elec. Corp., 150 NLRB 1574 (1965), the Hospital argues that it did not have an obligation to bargain over the subcontracting decision because it had an established practice of subcontracting this sort of work before the Union was certified. But the operative date is not the date of union certification (January 1997); it is the date of the election of the Union (December 1994). See NLRB v. Westinghouse Broadcast & Cable, Inc., 849 F.2d 15, 20-22 (1st Cir. 1988). Thus, for the Hospital to benefit from the safe harbor for an established past practice of subcontracting, the Hospital had to establish that it subcontracted this work on a consistent basis prior to December 1994.

-16-

The Board found that no such practice existed prior to 1994. One witness for the Hospital testified that the Hospital had subcontracted this work well before 1994. But the ALJ declined to credit this witness based on the Hospital's failure to produce any pre-1994 agreements showing the subcontracting of respiratory therapy or radiology technician work. Moreover, other witnesses testified that, prior to 1994, the Hospital used per diem employees to fill in when there was a shortage of respiratory therapists or radiology technicians. We cannot fault the Board's conclusion that the sporadic use of per diem employees is materially different from subcontracting out entire shifts of work. Thus, the Board's finding that there was no practice of subcontracting prior to December 1994 is supported by substantial evidence.[2]

The Hospital also argues that, as a matter of law, it did not have an obligation to bargain over its subcontracting decision because no union employee was laid off or replaced as a result of the subcontracting decision. Board precedent does not support the Hospital's argument. See Acme Die Casting, 315 NLRB 202, 202 n.1 (1994) (holding that there is no requirement that the

---

[2]Also relying on Westinghouse, supra, the Hospital argues that it had no duty to bargain because the subcontracting was motivated by economic concerns, namely, a shortage of workers willing to work the night, weekend, and holiday shifts. This argument also conflicts with the administrative findings of fact. The ALJ found the testimony concerning the economic motive for the subcontracting to be vague and lacking in credibility. The Board did not disturb this finding. After reviewing the administrative record, we cannot say that this conclusion was entirely without support.

subcontracting result "in situations in which employees are laid off or replaced" for it to be a mandatory subject of collective bargaining).

In Puerto Rico Tel. Co. v. NLRB, 359 F.2d 983, 987 (1st Cir. 1966), and W. Mass. Elec. Co. v. NLRB, 573 F.2d 101, 106 (1st Cir. 1978), we held that subcontracting is not a mandatory subject of collective bargaining unless the subcontracting results in the displacement of union workers. We were careful, however, to base our holdings on the ground that, at the time of decision, the Board had never held that a subcontracting decision had to be bargained over when there was no loss of union work. See W. Mass. Elec., 573 F.2d at 106 n.6. We recognized that because of the "possibly wide-ranging implications" of expanding the circumstances in which subcontracting would be a mandatory subject of bargaining, the Board was the body best equipped to adopt such a rule. Id.

This approach of permitting the Board to take the lead in developing the federal labor law is consistent with the Supreme Court's conception of the role of the NLRB. As the Court has explained:

> The responsibility to adapt the Act to the changing patterns of industrial life is entrusted to the Board . . . . It is the province of the Board, not the courts, [to make adjustments in the governing law] in light of changing industrial practices and the Board's cumulative experience in dealing with labor management relations. [T]he Board has the special function of applying general provisions of the Act to

-18-

the complexities of industrial life, and its special competence in this field is the justification for the deference accorded its determination. [Where the Board] engages in the difficult and delicate task of reconciling conflicting interests of labor and management, the balance struck by the Board is subject to limited judicial review.

NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266-67 (1974). After W. Mass. Elec. was decided, the Board concluded that the NLRA does not require a showing of job loss for subcontracting to be a mandatory subject of collective bargaining. See Acme Die, 315 NLRB at 202 n.1. In light of this development, our task normally would be limited to determining whether the Board's rule is a reasonable construction of the Act.

There is good reason for the Acme Die rule. Union members have an interest in an employer's subcontracting decision in addition to the potential for layoffs. This work provides bargaining unit members with the opportunity to obtain extra shifts (possibly at overtime rates) or to expand the size of the unit through the hiring of new employees. Considering these interests (and possibly others), the Board has reasonably concluded that the duty to bargain over subcontracting extends beyond the circumstance where the employer's subcontracting decision will result in the direct loss of union employment.

Finally, the Hospital contends that the Union waived its right to complain about the unilateral subcontracting of work

because the Hospital offered to bargain concerning the subcontracting in January 2000, and the Union declined the invitation. We disagree. The Hospital violated the Act by failing to <u>notify</u> the Union of its subcontracting decision. <u>See</u> <u>Penntech Papers, Inc.</u> v. <u>NLRB</u>, 706 F.2d 18, 27 (1st Cir. 1983). The Hospital cannot cure this violation with a post-hoc offer to negotiate. <u>See</u> <u>id.</u> The Hospital's offer to negotiate its subcontracting decisions, several years after the decisions were made, represents essentially an offer to negotiate over a "fait accompli." <u>Regal Cinemas</u> v. <u>NLRB</u>, 317 F.3d 300, 314 (D.C. Cir. 2003). The offer was too little, too late.[3]

## IV. Conclusion

For the reasons stated, we **<u>deny</u>** the Hospital's petition for review and **<u>enforce</u>** the Board's order.

**<u>So ordered</u>**.

---

[3]In a footnote to its brief, the Hospital asserts that the Board erred in denying its motion to dismiss the subcontracting claim involving the respiratory therapy work because of defects in the General Counsel's complaint. As this point was raised only by way of a cryptic footnote and is undeveloped, we will not consider it. <u>See</u> <u>Nat. Foreign Trade Council</u> v. <u>Natsios</u>, 181 F.3d 38, 60 (1st Cir. 1999).