# United States Court of Appeals
## For the First Circuit

Nos. 16-1556
16-1845

QUALITY HEALTH SERVICES OF P.R., INC.
d/b/a HOSPITAL SAN CRISTÓBAL,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

PETITIONS FOR REVIEW OF A DECISION AND ORDER
OF THE NATIONAL LABOR RELATIONS BOARD

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

José L. Nieto-Mingo, with whom Nieto Law Offices, José R.
González-Nogueras, Lloyd Isgut-Rivera, and Jiménez, Graffam &
Lausell were on brief, for petitioner/cross-respondent.
Barbara A. Sheehy, Attorney, National Labor Relations Board,
with whom Elizabeth Heaney, Supervisory Attorney, Richard F.
Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General
Counsel, John H. Ferguson, Associate General Counsel, and Linda
Dreeben, Deputy Associate General Counsel, were on brief, for
respondent/cross-petitioner.

October 16, 2017

**TORRUELLA, Circuit Judge**.  Quality Health Services of Puerto Rico, Inc., d/b/a Hospital San Cristóbal (the "Hospital"), petitions for review of an order of the National Labor Relations Board ("NLRB" or the "Board") declaring that the Hospital had committed several unfair labor practices, in violation of section 8 of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 158.  The Board cross-applies for enforcement of that order.  After careful consideration, we deny the Hospital's petition for review and grant the Board's cross-petition for enforcement.

## I.  Background

### A.  The Hospital Considers Cost-Cutting Measures

During the relevant time period, Unidad Laboral de Enfermeras(os) y Empleados de la Salud (the "Union") was the exclusive collective-bargaining representative for most of the Hospital's approximately three-hundred employees, including the Hospital's respiratory therapy technicians.  By 2009, the Hospital was experiencing a decrease in its number of patients, which led it to consider and implement cost-cutting measures. Between 2009 and 2010, the Hospital, without notifying or bargaining with the Union, implemented a number of changes to cut operating costs. These changes ultimately led to two Board decisions finding that the Hospital had engaged in unfair labor practices.  See Hosp. San

-2-

Cristóbal, 358 N.L.R.B. 547 (2012); Hosp. San Cristóbal, 356 N.L.R.B. 699 (2011). The collective bargaining agreement ("CBA") between the Hospital and the Union (together, the "Parties") expired on February 28, 2010, during which time the Parties were amid negotiating a successor CBA. In January 2011, continuing its cost-cutting plan, the Hospital considered subcontracting the services of its employees in the Respiratory Therapy Department ("Department"). On March 15, 2011, Hospital Executive Director Pedro Benetti notified the Union by letter that the Hospital intended to subcontract the Department, and offered the Union an opportunity to "negotiate the impact of [the] decision." Between March 24, 2011, and April 12, 2011, the Hospital and the Union met on several occasions to engage in bargaining around that issue.[1]

## B. The Parties Bargain

On March 28, 2011, while negotiations were ongoing, the Hospital subcontracted with the private company Respiratory Therapy Management ("RTM") to provide non-unit respiratory therapy technicians on an as-needed basis to cover absences by the hospital's unit employees. Under the expired CBA, the Hospital was permitted to hire "temporary employees" for emergencies,

---

[1] The Parties dispute whether the subject of these discussions was just the effects of the Hospital's decision to subcontract the Department, or both the effects and the decision itself.

"absence due to illness, vacation or any other similar motive." Nonetheless, according to the Hospital's Human Resources Director, Candie Rodríguez ("Rodríguez"), RTM's as-needed employees did not count as temporary employees. On March 30, 2011, Union representatives Ariel Echevarría ("Echevarría") and Evelyn Santa met with Rodríguez to discuss a grievance. After the meeting, Rodríguez circulated a memorandum directing employees to stop discussing the possible subcontracting of other departments. By early April 2011, the number of full-time union respiratory therapy technicians had dropped from eleven to eight, after three technicians resigned.

On April 12, 2011, the Parties engaged in a bargaining session during which the Hospital acknowledged, on advice of counsel, that it should negotiate with the Union both the decision to subcontract the Department and the decision's effects. The Hospital then offered the Union an opportunity to present alternatives to subcontracting, and postponed the proposed subcontracting on approximately six different occasions.[2]

---

[2] The Hospital asserts that the Union "engaged in dilatory tactics to avoid bargaining and unduly delay any decision the Hospital had to take." The Union disputes this and asserts, instead, that the Hospital did not provide it with the necessary financial information and projected savings from subcontracting that would have allowed the Union to present alternatives until July 5, 2011.

-4-

## C.    The Parties Discuss a Food Stipend-Cutting Alternative

On May 27, 2011, Echevarría and Rodríguez met informally to discuss possible alternatives to subcontracting, including reducing the Hospital's payment in monthly food stipends to unit employees.   On June 17, the Hospital proposed reducing that monthly stipend from $55 to $15 per employee, which would have resulted in monthly savings of $7,400 per month, or eliminating the food stipend completely, which would have saved $10,175 per month.   In comparison, if the Hospital completely subcontracted the work then performed by the Department's unit employees, the projected monthly savings would have been $7,243.   Rodríguez noted that if the Union agreed to any one of the proposals, the eight regular employees would retain their positions, but the Hospital would still continue to use RTM employees as needed, and would not assign unit employees to permanent shifts.

The Parties held bargaining sessions on June 28 and July 5 to discuss adjusted savings projections in light of the Department's reduction to eight employees.   These new projections showed monthly savings of $4,998 ($59,976 annually) if the work was subcontracted.

## D. The Parties Do Not Agree and The Hospital Implements the Subcontracting Plan

At the next bargaining meeting on July 8, 2011, the Union presented a proposal addressing the proposed alternative involving

-5-

reducing food stipends. The Union proposed reducing the stipend to $30, which brought the Parties within $373 of each other in terms of monthly cost savings for the Hospital. Union's proposal also included other conditions.[3] Later that day, the Hospital rejected the proposal because the Union's conditions -- including filling vacancies with regular employees, granting the permanent shift of 7:00 AM to 3:00 PM to the two most senior unit employees, and limiting the food stipend reduction to one year -- would not result in the savings the Hospital desired. After this meeting, the Hospital determined that the Parties had reached an impasse, and thus implemented its decision to subcontract the Department.

Later that same day, at approximately 2:30 PM, Rodríguez began notifying the Department's eight unit employees of their termination. Additionally, the Hospital called in the Department's off-duty employees, and terminated them upon arrival. The Hospital provided each terminated employee with a termination letter, stating that the employee was immediately relieved from

---

[3] The Union proposed the following conditions: (1) future vacancies in the Department should be filled with regular employees; (2) the food stipend reduction should be limited to a duration of one year; (3) the Parties should meet every trimester to evaluate whether the Hospital was reaching its projected savings; (4) the two senior unit employees in the Department should be granted permanent shifts from 7:00 AM to 3:00 PM; and (5) if the Hospital reached its projected savings, the food stipends would return to the original fifty-five dollar amount.

-6-

occupational duties, but would receive payment through July 13, 2011.  RTM staff covered the terminated employees' shifts.

**E. The Parties Continue Negotiations But Fail to Reach an Agreement**

Still later on July 8, 2011, Union President Ana Meléndez told Rodríguez that the Union was available to continue negotiations until a "satisfactory agreement" could be reached. The Parties met later that night, but could not agree on a stipend amount or whether the two most senior unit employees could be granted permanent shift assignments.  The Hospital required that the monthly food stipend be reduced to $25 per employee, which would have resulted in savings exceeding those of subcontracting. The Union stated it would agree to reduce the food stipend to $25 if, in exchange, the Hospital granted the Union's two most senior employees a permanent shift.  The Hospital refused to grant those permanent shifts, and around 8:00 PM, the meeting ended without an agreement.

On July 11, 2011, the Hospital sent a letter to the Union describing the Parties' positions and stating "nothing else is pending to address regarding the [subcontracting] issue."  The Union responded the same day, stating that the Union did not close negotiations and wanted to continue negotiating.  On July 18, the Union again wrote to the Hospital asking that it engage in further

dialogue.  The Board claims the Hospital did not respond to the Union's letters.

**F.  NLRB Adjudication**

The Union filed charges against the Hospital with the NLRB on April 12, 2011, and June 29, 2011, alleging that the Hospital had engaged in unfair labor practices as part of its cost-saving efforts.[4]  On August 31, 2011, the Acting General Counsel of the NLRB, Lafe Solomon, issued a consolidated complaint involving both cases, which was later amended on October 20 and November 17, 2011.  The complaint alleged that the Hospital violated sections 8(a)(1) and 8(a)(5) of the NLRA by unilaterally subcontracting work performed by respiratory therapy technicians, prohibiting employees from discussing the Hospital's subcontracting of the Department, limiting its past practice for scheduling vacation of Department employees, and terminating respiratory therapy technicians.

The Administrative Law Judge ("ALJ") Geoffrey Carter heard the case in November and December of 2011.  After a five-day hearing, the ALJ concluded that the Hospital refused to bargain with the Union, unilaterally terminated unit employees, and subcontracted respiratory therapy technician work without

---

[4]  On August 19, 2011, the Union amended these charges.

affording the Union an opportunity to bargain the decision and its effects. Hosp. San Cristóbal, 358 N.L.R.B. 769, 781 (2012). In his decision, issued on February 2, 2012, the ALJ found that the Hospital violated section 8(a)(1) of the NLRA by implementing a rule that prohibited employees from discussing the Hospital's subcontracting plans for respiratory therapy technicians, and violated section 8(a)(1) and 8(a)(5) by unilaterally subcontracting the Department's work and terminating all respiratory therapy technicians in favor of workers from RTM. Id. The Hospital filed various exceptions to the ALJ's findings. On April 28, 2016, the Board, consisting of Chairman Pearce and Members Hirozawa and McFerran, affirmed the ALJ's rulings, and adopted the ALJ's recommended Order with some modifications.[5] Hosp. San Cristóbal, 2016 N.L.R.B. LEXIS 308 (2016). The Board issued a Decision and Order agreeing with the ALJ's rulings, findings, and conclusions. Id. That Order required the Hospital

---

[5] Back on July 25, 2012, the Board, consisting of Members Hayes, Griffin, and Block, had adopted the ALJ's decision. Hosp. San Cristóbal, 358 N.L.R.B. 769 (2012). The Hospital filed a Petition to Review before this Court, and the Board sought enforcement. On January 30, 2015, in light of NLRB v. Noel Canning, 134 S. Ct. 2550 (2014) -- where the Supreme Court held that three recess appointments to the Board from January 2012 were invalid, including the appointment of Members Griffin and Block -- the Board requested that this Court vacate the Board's July 25, 2012 Order and remand the case to the Board. Hosp. San Cristóbal, 2016 N.L.R.B. LEXIS 308 (2016). Subsequently, the Board reviewed the ALJ's determination de novo. Id.

to: (1) cease and desist from all unfair labor practices "interfering with, restraining, or coercing employees in the exercise of" their statutory rights; (2) bargain with the Union; (3) cease subcontracting the respiratory therapy technicians' work; (4) make the impacted respiratory therapy technicians whole and offer reinstatement to the terminated technicians; (5) post a remedial notice; and (6) rescind the prohibition on discussing the subcontracting decision, the decision to subcontract unit work to as-needed employees, and the terminations. The Hospital timely challenged this April 28, 2016 Decision and Order. The Board subsequently submitted a cross-application for enforcement of its Order.

## II. Discussion

### A. Jurisdiction to Consider the Validity of the Complaints

The Hospital challenges for the first time the validity of the underlying unfair labor practice complaints. The Hospital argues that because Acting General Counsel Solomon was serving in violation of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 et seq., at the time he issued the complaints against the Hospital, the complaints were voidable. The Hospital further argues that because the incoming General Counsel did not ratify the complaints, they must be set aside.

-10-

In so contending, the Hospital relies mostly on SW Gen., Inc. v. NLRB, in which the D.C. Circuit held that the NLRB's Acting General Counsel Solomon was serving in violation of the FVRA when he issued the complaint against SW General, and therefore vacated the Board's order against SW General. 796 F.3d 67, 72 (D.C. Cir. 2015). The Supreme Court recently affirmed that decision, concluding that after January 5, 2011, when President Obama nominated Solomon to serve as General Counsel, the FVRA prohibited Solomon from continuing to serve as Acting General Counsel.[6] NLRB v. SW Gen., Inc., 137 S. Ct. 929, 943-44 (2017). According to the Hospital, because Acting General Counsel Solomon issued the complaints against it after January 5, 2011, when the FVRA prohibited him from continuing his acting service, those complaints are invalid.

Unlike in SW General, however, the Hospital did not raise this argument before the Board. See 796 F.3d at 82. The Hospital

---

[6] 5 U.S.C. § 3345(b) prohibits a person from serving as acting officer once the President submits a nomination of such person to the Senate for appointment to such office, unless: (1) the person has served in that same office as first assistant for at least ninety (90) days "during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve" of the officer of the Executive agency, or (2) the Senate confirmed such person as a first assistant of that office. 5 U.S.C. § 3345(b); SW Gen., Inc., 796 F.3d at 72-73. Prior to his appointment as NLRB's Acting General Counsel, Solomon had never served as first assistant at the NLRB, or any other agency.

-11-

acknowledges the general rule that arguments "not raised in the lower courts [or administrative agencies] cannot be brought for the first time on appeal[]" and concedes that it did not raise this issue before the Board. Nonetheless, it urges us to relieve it of its forfeiture, arguing that this case involves "extraordinary circumstances."

We have jurisdiction to review the Board's final Order, and the application for enforcement, pursuant to 29 U.S.C. § 160(e) and (f). Our jurisdiction over particular issues, however, is limited by section 10(e) of the NLRA, which establishes an exhaustion requirement by providing that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); see Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666 (1982) (holding that "the Court of Appeals lacks jurisdiction to review objections that were not urged before the Board"). Thus, we have jurisdiction to consider an argument made for the first time before us only if the statutory "extraordinary circumstances" exception is met. See Detroit Edison Co. v. NLRB, 440 U.S. 301, 311 n.10 (1979) (stating that "unless a party's neglect to press an exception before the Board is excused by the statutory 'extraordinary circumstances'

-12-

exception or unless the Board determination at issue is patently in excess of its authority, we are bound by it"); see also Pegasus Broad. of San Juan, Inc. v. NLRB, 82 F.3d 511, 514 (1st Cir. 1996) ("[W]e lack the same broad right or supervisory power over the Board that we might have over a district court on new matter."). We are not persuaded that this case presents extraordinary circumstances that warrant relieving the Hospital of its forfeiture.

The Hospital argues that the "extraordinary circumstance" is met here because the validity of the complaints issued by Acting General Counsel Solomon involves a "purely legal issue" and that "this was a straightforward case of statutory interpretation." But the Hospital does not cite any authority establishing that raising a "purely legal issue" constitutes an extraordinary circumstance. And, if we accepted this ground as an extraordinary circumstance, little would be left of the statutory forfeiture rule. Furthermore, if, as the Hospital asserts, "this was a straightforward case of statutory interpretation," we find it even harder to understand why it never raised this issue before the Board and why its apparent ignorance about the FVRA provisions amounts to an extraordinary circumstance.

The Hospital also urges us to find that this case presents extraordinary circumstances because, at the time the Board cross-applied for enforcement of the NLRB Order, "the Board knew or should've known of the problems that would arise from Solomon's actions" after his nomination in January 2011. But that argument cuts both ways. We are hard-pressed to find that this amounts to an extraordinary circumstance when all of the facts and legal arguments necessary to raise this issue were also available to the Hospital before the Board, and when this same matter was so prominently litigated in other courts. As it turns out, by the time this case was before the Board, both the D.C. Circuit and the Ninth Circuit had issued opinions addressing the validity of complaints issued by Acting General Counsel Solomon after he was nominated to fill the position of General Counsel. See Hooks v. Kitsap Tenant Support Servs. Inc., 816 F.3d 550 (9th Cir. 2016); SW Gen., Inc., 796 F.3d 67. Thus, the Hospital was also in a position to raise the argument before the Board. And, although it is true that the Board must have known by that time that there were problems with Solomon's actions while he was serving as Acting General Counsel after January 5, 2011, the Board also disagreed with the D.C. Circuit's ruling in SW General and was actively contesting it before the Supreme Court. See Ford Motor Co. v. NLRB, 441 U.S. 488, 493 (1979) (noting that the Board had adhered

-14-

to its legal position despite the fact that said position had "not been accepted by reviewing courts").  Furthermore, if an attempt to salvage a barred claim by relying "on arguments raised in a dissent or on a discussion of the relevant issues by the majority" has been found insufficient to overcome the section 10(e) bar, see, e.g., HTH Corp. v. NLRB, 823 F.3d 668, 673 (D.C. Cir. 2016), it certainly should not suffice in a case such as this one where the issue was nowhere raised by anyone.

Finally, the Hospital argues that this case meets the "extraordinary circumstances" exception because this is an issue of great importance that involves the "type of over-reaching for authority by the Board . . . that the Supreme Court struck down in Noel Canning v. NLRB, 134 S. Ct. 2550 (2014)."  We are unpersuaded. We have previously rejected the argument that merely raising a potentially important issue satisfies the extraordinary circumstance requirement.  See Edward St. Daycare Ctr., Inc. v. NLRB, 189 F.3d 40, 44 (1st Cir. 1999) ("[The petitioner] raise[d] a potentially important issue which was never presented to the Board during the unfair labor practice proceedings.  This omission is fatal to the consideration of this issue here.").  Furthermore, we find Noel Canning distinguishable.  In Noel Canning the D.C. Circuit found an order of the NLRB to be void ab initio for lack of quorum because the President had appointed three of the five

-15-

Board members under the Recess Appointments Clause while he lacked authority to do so, meaning that the Board could not exercise its power. Noel Canning v. NLRB, 705 F.3d 490, 493, 497-98, 513-14 (D.C. Cir. 2013) (citing New Process Steel, L.P. v. NLRB, 130 S. Ct. 2635 (2010)), aff'd, 134 S. Ct. 2550 (2014). These amounted to extraordinary circumstances that allowed the petitioner to challenge the validity of the NLRB order notwithstanding section 10(e)'s exhaustion requirement. Id. at 497; see also NLRB v. Cheney Cal. Lumber Co., 327 U.S. 385, 388 (1946) ("[I]f the Board has patently traveled outside the orbit of its authority" then "there is legally speaking no order to enforce."). Here, however, the Hospital does not challenge the Board's authority to act, but rather challenges the service of a single officer. See Marquez Bros. Enters., Inc. v. NLRB, 650 F. App'x 25, 27 (D.C. Cir. 2016) (declining to consider the petitioner's argument that Acting General Counsel Solomon's service violated the FVRA inasmuch as the petitioner had not presented the issue to the Board, and drawing a distinction between a challenge "based on the agency's lack of authority to take any action at all" and "attack[ing] the service of a single officer"). Furthermore, the Hospital concedes that, unlike the complaint in

Noel Canning, the complaints at issue here were not void ab initio, but rather simply voidable.[7]

Because the Hospital failed to raise the issue before the Board, and has not shown any extraordinary circumstances excusing its forfeiture, we lack jurisdiction to consider its claim regarding the validity of the complaints issued by Acting General Counsel Solomon. Our decision is consistent with SW General, on which the Hospital heavily relies, in which the D.C. Circuit "emphasize[d] the narrowness of [its] decision," clarified that the case was "not Son of Noel Canning," and that it did not expect its decision to "undermine a host of NLRB decisions." SW Gen., Inc., 796 F.3d at 82-83. The D.C. Circuit explained that it had "address[ed] the FVRA objection in [that] case because the petitioner [had] raised the issue in its exceptions to the ALJ decision as a defense to an ongoing enforcement proceeding," id. at 83, and expressed "doubt that an employer that failed to timely raise an FVRA objection -- regardless [of] whether [the]

---

[7] Although we find it unnecessary to decide whether the complaints were void or voidable, we accept the Hospital's concession and note that, while section 3348(d) of the FVRA states that "[a]n action taken by any person who is not acting [in compliance with the FVRA] . . . shall have no force or effect" and "may not be ratified", thus rendering any action taken in violation of the statute void ab initio, the NLRB's General Counsel is exempted from the provisions of section 3348. See 5 U.S.C. § 3348(d)(1)-(2) and (e)(1).

enforcement proceedings are ongoing or concluded -- will enjoy the same success."  Id.  In conformity with its suggestion in SW General, in Marquez Bros. Enters., Inc., the D.C. Circuit declined to consider the petitioner's similar argument inasmuch as the petitioner had not raised it before the Board.  650 F. App'x at 27.  Moreover, other circuits have similarly refused to allow petitioners to challenge the validity of actions taken by Acting General Counsel Solomon when those petitioners failed to challenge them first before the Board.  See NLRB v. Pier Sixty, LLC, 855 F.3d 115, 121 (2d Cir. 2017) (holding that "even an apparently meritorious challenge to the authority of an NLRB agent in itself does not qualify as an 'exceptional circumstance' allowing the party to raise the argument for the first time before our Court"); 1621 Route 22 West Operating Co., LLC v. NLRB, 825 F.3d 128, 142 (3d Cir. 2016) (refusing to consider the petitioner's challenge to the validity of a complaint issued by Acting General Counsel Solomon after January 5, 2011, because the petitioner failed to make that objection before the Board, and refusing to look to "some non-statutory ground" beyond the extraordinary circumstances exception to section 10(e) for purposes of excusing petitioner's failure to exhaust); see also Hooks, 816 F.3d at 564 (noting that "not . . . every violation of the FVRA will result in the invalidation of the challenged agency action").

Accordingly, pursuant to the section 10(e) exhaustion bar, we lack jurisdiction to consider the Hospital's challenge, on the basis of the FVRA, to the Board's Order.  We now proceed to consider the objections that the Hospital did make before the Board.

**B.  The Hospital's NLRA Violations**

This Court defers to the Board's interpretation of the Act, "as long as its interpretation is rational and consistent with the statute."  Ryan Iron Works, Inc. v. NLRB, 257 F.3d 1, 6 (1st Cir. 2011) (quoting NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 25 (1st Cir. 1999)).  "A Board order must be enforced if the Board correctly applied the law and if its factual findings are supported by substantial evidence on the record."  NLRB v. Ne. Land Servs., Ltd., 645 F.3d 475, 478 (1st Cir. 2011).  Substantial evidence, in turn, means "relevant evidence" that a "reasonable mind might accept as adequate to support a conclusion."  NLRB v. Int'l Bhd. of Teamsters, Local 251, 691 F.3d 49, 55 (1st Cir. 2012) (internal quotations omitted).  When this Court must decide "between two fairly conflicting views," this Court will not substitute its judgment for the Board's, even if it "would justifiably have made a different choice had the matter been before it de novo."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Specifically, due to the ALJs' proximity to witnesses,

their credibility determinations "are entitled to great weight." NLRB v. Hosp. San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000).

It is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The duty to bargain collectively is "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). "An employer violates this duty when he changes a mandatory term or condition of employment without giving the employee's representative adequate notice and an opportunity to bargain." Pan Am. Grain Co. v. NLRB, 558 F.3d 22, 26 (1st Cir. 2009). "[A]n employer has a duty to bargain to impasse with its employees over the terms and conditions of employment before making a unilateral change in conditions." Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R. v. NLRB, 414 F.3d 158, 165 (1st Cir. 2005) (citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991)).

Furthermore, an employer is subject to the duty to bargain if its decision to subcontract work consists of "replac[ing] existing employees with those of an independent contractor to do the same work under similar conditions of employment." Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203,

-20-

213 (1964). This requirement encompasses, as a general rule, "an employer's decision to subcontract work that could be performed by members of the bargaining unit." Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 414 F.3d at 165 (citing Fibreboard Paper, 379 U.S. at 209-17). "Failure to bargain over subcontracting in such circumstances violates sections 8(a)(1) and 8(a)(5) of the Act."[8] Id.

Here, the Board affirmed the ALJ's determination that the Hospital violated sections 8(a)(1) and 8(a)(5) of the Act in both deciding to hire subcontractors and firing the Hospital's respiratory therapy technicians without first bargaining with the Union. Hosp. San Cristóbal, 358 N.L.R.B. at 779 & n.27. Because substantial evidence in the record supports the Board's determinations on both fronts, we affirm the Board's finding that the Hospital engaged in unfair labor practices.

**1. The Hospital's Decision to Subcontract the Department**

First, substantial evidence supports the Board's determination that the Hospital did not provide the Union adequate

---

[8] Section 8(a) of the Act establishes that "[i]t shall be an unfair labor practice for an employer -- (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [29 U.S.C. § 157]" and "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [29 U.S.C. § 159(a)]." 29 U.S.C. § 158(a)(1), (5).

notice and opportunity to bargain regarding the Hospital's decision to subcontract. The Hospital informed the Union of its decision on March 15, 2011. On March 24, 2011, the Hospital first invited the Union to discuss the decision, but only with regard to the decision's impact. Shortly thereafter, on April 7, 2011, the Hospital signed a contract with RTM to provide per diem respiratory therapy technicians to the Hospital. The Hospital argues that it was not required to bargain with the Union regarding this decision because it had an established practice of using professional services to hire per diem employees to cover vacant shifts or to substitute for absent employees.

We have recognized an exception to the duty to bargain for the subcontracting of union work, whereby an employer may "benefit from [a] safe harbor for an established past practice of subcontracting" by establishing "that it subcontracted [the] work on a consistent basis prior to [the election of the Union]." Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 414 F.3d at 166 (citing NLRB v. Westinghouse Broad. & Cable, Inc., 849 F.2d 15, 20-22 (1st Cir. 1988)); Westinghouse Elec. Corp., 150 N.L.R.B. 1574, 1577 (1965) (finding that an employer did not need to provide an opportunity to bargain with the union regarding its decision to subcontract union work because, among other reasons, that decision was consistent with the employer's

-22-

traditional business operations and established practices, and it did not have a demonstrable impact on union employees).

Here, the Board concluded that the Hospital had failed to show that it had consistently previously relied on subcontracting and thus was not exempt from the duty to bargain. Hosp. San Cristóbal, 358 N.L.R.B. at 779 n.27. The Hospital argued that its decision to subcontract employees was both consistent with past practices and with the expired CBA between the Hospital and the Union. That CBA had allowed for temporary employees to "substitute a regular employee in case of absence due to illness, vacation or any similar motive." However, the testimony of Rodríguez, the Hospital's Human Resources Director, undermined both of these contentions. During her testimony, Rodríguez admitted that the Hospital only hired per diem employees intermittently, and conceded that the new per diem subcontractors were not considered temporary employees. Intermittent use of per diem subcontracted employees is insufficient to establish past practices for purposes of avoiding the duty to engage in collective bargaining. See Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 414 F.3d at 166 (affirming the Board's conclusion that the sporadic use of per diem employees for employee shortages was not equivalent to a past practice of subcontracting that would have allowed the defendant hospital to act unilaterally in hiring

-23-

subcontractors). Furthermore, given Rodríguez's concession that the new employees were not considered temporary employees, the Hospital cannot rely on those provisions in the CBA to argue that this new development was consistent with Union-negotiated past practices. Therefore, substantial evidence supports the Board's determination that the Hospital was not entitled to the past practice exemption, and therefore that its unilateral decision to hire subcontractors to perform union work violated sections 8(a)(1) and 8(a)(5).

2. **The Hospital's Decision to Terminate the Respiratory Therapy Technicians**

Second, there is substantial evidence that the Hospital did not bargain to an impasse with the Union regarding its decision to terminate the union employees and subcontract their work to the new per diem employees. Sections 8(a)(1) and 8(a)(5) prohibit an employer from implementing "a unilateral change of an existing term or condition of employment" without first bargaining to an impasse. Litton Fin. Printing Div., 501 U.S. at 198 (citing NLRB v. Katz, 369 U.S. 736, 743 (1962)); see also Beverly Enters.-Mass., Inc., 174 F.3d at 25 (finding failure to bargain to impasse prior to unilateral change constitutes an unfair labor practice under the Act). A good-faith impasse occurs when "the parties are deadlocked so that any further bargaining would be futile," and "no realistic prospect" exists that continued bargaining would be

-24-

"fruitful." Beverly Enters.-Mass., Inc., 174 F.3d at 27 (quoting Teamsters Local Union No. 639 v. NLRB, 924 F.2d 1078, 1083 (D.C. Cir. 1991)). The party asserting the existence of an impasse has the burden of proving that the impasse existed when it implemented the unilateral change in question. Ryan Iron Works, Inc., 257 F.3d at 12.

Determining whether an impasse exists is "an intensely fact-driven question." Visiting Nurse Servs. of W. Mass., Inc. v. NLRB, 177 F.3d 52, 58 (1st Cir. 1999). The Board may consider factors such as "the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations." Ryan Iron Works, 257 F.3d at 12 (quoting NLRB v. Charles D. Bonanno Linen Serv., Inc., 630 F.2d 25, 35 n.24 (1st Cir. 1980)). Crucially, an impasse does not exist where either party is willing to continue negotiating towards an agreement. Teamsters Local Union No. 639, 924 F.2d at 1084 ("[T]he parties' perception regarding the progress of the negotiations is of central importance to the Board's impasse inquiry."); PRC Recording Co., 280 N.L.R.B. 615, 635 (1986), enforced, 836 F.2d 289 (7th Cir. 1987) (asserting that an impasse

does not exist unless "[b]oth parties . . . believe that they are at the end of their rope").

Here, the Hospital and Union continued to negotiate after the Hospital issued termination letters to the respiratory therapy technicians in the Union. This supports the Board's view that the Parties were not, in fact, at an impasse. While the Hospital did allow the Union an opportunity to discuss the further subcontracting of union work and those discussions did not bear fruit, there is substantial evidence that the Parties did not bargain to impasse before the Hospital terminated the respiratory therapy technicians.

From April 14, 2011, to July 8, 2011, the Hospital and the Union discussed allowing the Union to suggest alternative cost-saving measures other than subcontracting. Then, on July 8, 2011, the Hospital dismissed all of the respiratory therapy technicians in order to subcontract all union work to RTM. However, later that same evening, negotiations resumed at a meeting between the Hospital and the Union, described by Rodríguez as "one last attempt to reach an agreement." As Teamsters Local Union No. 639 suggests, there is no impasse if either party is still willing to negotiate. 924 F.2d at 1084. Moreover, the Parties could not have been at an impasse if the Hospital was willing to further discuss the issue with the Union, for why would negotiations continue that evening

if "further bargaining would be futile[?]" <u>Beverly Enters.-Mass.,</u> <u>Inc.</u>, 174 F.3d at 27. Thus, the Hospital's continued attempts to negotiate with the Union belie its contention that the Parties were at an impasse when it decided to dismiss the union employees.

There are, however, two exceptions to the requirement that an employer bargain with a union to impasse. <u>RBE Elecs. of</u> <u>S.D., Inc.</u>, 320 N.L.R.B. 80, 81 (1995). An employer can act unilaterally if the Union engages in delaying tactics or because of economic exigencies. <u>Id.</u> The Hospital attempts to show that both of these exceptions applied and, thus, that it did not violate the Act. We are unpersuaded.

First, the Hospital argues that the Union used delaying tactics to draw out negotiations. These allegations are unfounded. There is no evidence in the record that the Union unduly delayed negotiations. On the contrary, the Union responded with a counterproposal to subcontracting within a mere three days after the Hospital proffered accurate savings information reflecting the correct number of employees. Further, the Union reacted to the Hospital's implementation of its subcontracting decision with specific requests for continued negotiations that included concessions, demonstrating a flexibility and desire to continue to negotiate and make progress towards a resolution. Thus, the Union engaged in good-faith negotiations and the Hospital

-27-

was not relieved of its duty to negotiate.  See Katz, 369 U.S. at 742-43.

Second, we find substantial evidence in the record supporting the Board's finding that the Hospital's conduct was not justified by any economic exigency.  Hosp. San Cristóbal, 358 N.L.R.B. at 781 n.28.  Economic exigencies only justify unilateral action absent an impasse when "extraordinary events which are 'an unforeseen occurrence, [have] a major economic effect [requiring] the company to take immediate action.'"  RBE Elecs. of S.D., Inc., 320 N.L.R.B. at 81 (second alteration in the original) (quoting Hankins Lumber Co., 316 N.L.R.B. 837, 838 (1995)).  The record clearly demonstrates that the Hospital had known of its revenue decline since 2009, making the need for cost savings, including the possibility of subcontracting, foreseeable.  The Hospital's decision to subcontract two years later in 2011 was therefore not in response to any immediate exigency.  Absent an unforeseeable emergency requiring immediate action, the Hospital's unilateral implementation of subcontracting the Department and firing the respiratory therapy technicians was not excused or justified.

Without showing that the bargaining was at an impasse, that the Union did not engage in good-faith negotiations, or that the Hospital was facing an economic emergency, the Hospital has failed to show any reason to undermine the conclusion of the Board

that the Hospital violated sections 8(a)(1) and 8(a)(5) of the Act by terminating the respiratory therapy technicians on July 8, 2011.

**C.  The Hospital's Challenge to the Board's Remedy Is Not Properly Before the Court.**

Finally, the Hospital asks us to vacate the Board's Order awarding reinstatement and back pay to the union employees terminated in violation of the Act, alleging that enforcement of the Order would require an investment that the Hospital cannot afford at this time due to its delicate financial situation.  The Hospital, however, failed to raise this issue before the Board. Further, the Hospital did not allege, much less prove, that its failure to preserve its challenge to the remedy was due to extraordinary circumstances.  Accordingly, under section 10(e) of the NLRA, we are precluded from reviewing this claim.  See 29 U.S.C. § 160(e); Woelke & Romero Framing, Inc., 456 U.S. at 665.

### III.  Conclusion

For the foregoing, we **deny** the Hospital's petition for review and we **grant** the Board's cross-petition for enforcement.